SMITH, Appellant, vs. CITY OF BELOIT and others, Respondents.

*May 13—September 27, 1904.*

*Public lands: Conveyance by entryman before patent: Platting lands: Invalid dedication of streets: Rights of purchasers: Changes in streets by public authorities: Acceptance of dedication: Plat by nonowner of land: Locating lines of streets.*

1. Where the entryman, after having paid for government land and received the register's certificate of purchase, but before the issuance of the patent, conveys to another, the legal title vests in the grantee upon the issuing of the patent.

2. Where the owner of land made and recorded a village plat thereof, showing lots, blocks, and streets, and sold and conveyed lots with reference to such plat, even though, for want of the proper acknowledgement and certification, such plat was not a valid statutory dedication to the public of the streets shown thereon, yet as between the grantor and grantees and those claiming under them there was a complete and irrevocable dedication of the streets upon which the lots conveyed abutted, the grantees taking title to the center of such streets, subject only to the public easement, and the grantor having thereafter no right, title, or interest therein which he could convey to any one.

3. An order of the supervisors of the town in which such village plat was situated, purporting to lay out a highway within the limits of a street shown on the plat, but narrower, and declaring that the same was intended to be in conformity to the original survey of the street, was effectual, at most, to limit the duty of the town to keeping in repair that part of the street so designated as a highway, but did not take away any of the rights of the owners of the abutting lots in the space shown as a street on the plat; nor did a subsequent ordinance

of the common council of the city then embracing the lands, attempting to locate the line of the street, take away any of such rights.

4. Long-continued use by the public of a street as shown on such plat, by travel thereon to its full width, will constitute an acceptance of the common-law dedication made by the recording of the plat, making such dedication complete as to the public.

5. A subsequent plat made by one claiming under a quitclaim deed of the whole tract, given by the original owner after his conveyance of lots and blocks shown on his own plat, could not affect the rights of the grantees of such lots and blocks, and the lines of the streets upon which the same abut are to be located according to the original plat.

6. Where one side of a block shown on a village plat, as located upon the ground and actually occupied by the owners thereof soon after the making of the plat, was recognized and acquiesced in by all as the line of the street for more than forty years, fences being built, sidewalks laid, trees planted, and buildings constructed with reference to such line, such practical construction of the plat is entitled to great weight in determining the true location of the line, and has greater probative force than mere measurements of courses and distances as to which there are mistakes and discrepancies in the original survey.

APPEAL from a judgment of the circuit court for Rock county: B. F. DUNWIDDIE, Circuit Judge. *Affirmed.*

This is an action to quiet the title to lands fronting on Public avenue, in *Beloit,* and to establish the boundaries of that avenue, and for a mandatory injunction. The respective defendants answered by way of admissions, denials and counter allegations, and prayed a dismissal of the complaint, and some of them by way of counterclaim alleged that the plaintiff's buildings were in such avenue, and sought to have them removed therefrom and for an injunction to maintain the avenue, as claimed by them, unobstructed. The plaintiff, by way of replies, put in issue the several allegations of such counterclaims.

It is undisputed that Public avenue is bounded on the east by Pleasant street, and on the west by Turtle street, now

known as State street, which extends to the easterly shore of Rock river; that the plaintiff owned lands upon the north side of Public avenue and abutting thereon, and that the defendants *Burdge, Voorhees,* and *Greene,* respectively, owned lands on the south side of Public avenue and abutting thereon. The principal issue involved is as to the location of the lawful boundary lines of Public avenue.

A trial having been had, the court, in addition to admitted facts, found as matters of fact, in effect:

(1) That November 26, 1838, one Robert P. Crane entered fractional lots 6 and 7 in section 35, in township 1 north, of range 12 east, within which the original village of *Beloit* was wholly located. That said lots were bounded on the north by the quarter section line, on the east by the east line of that section, and on the south by the south line thereof, and on the west by Rock river.

(2) That March 18, 1839, Crane, as the owner of said fractional lots, and one Otis P. Bicknell, as the owner of fractional lot 5 in the same section (being lands adjacent thereto on the east and north), caused the lands so owned by them to be surveyed, and a village plat thereof to be made by one A. W. Doolittle, marked "Map of Beloit," which, together with the descriptive notes thereon, constituted one paper, followed by a certificate of Doolittle, as county surveyor, that the same were true and correct, and certified by Crane and Bicknell and two others to be true and correct, and acknowledged by Crane and Bicknell before a justice of the peace, to the effect that such certificate was executed by them according to law; and the same was recorded in the register's office September 24, 1839. That there are delineated upon said plat blocks, streets, and public grounds. That the blocks are subdivided into lots, which lots are numbered with progressive numbers, but the length and width of said lots are not marked on said blocks or plat. That among the blocks so delineated is one numbered 46, which is bounded on the east by Pleas-

ant street, on the south by Public avenue and the north end of an area marked "Public Landing," and on the west by Rock river, and is subdivided into eight lots fronting easterly on Pleasant street and extending westerly to the river. That said lots are numbered in progressive numbers from lot 1 on the south side of said block 46 to lot 8 on the north side thereof. That there is also a block delineated on said map and

numbered 47, which is bounded on the east by Pleasant street, on the south by School street, and on the west by Turtle (now State) street, and on the north by Public avenue. That immediately south of block 47 is block 48, bounded by School street on the north, Pleasant street on the east, Broad street on the south, and Turtle or State street on the west. That im-

mediately west of block 48 is block 59, bounded on the east by Turtle or State street, on the south by Broad street, and on the west and north by Public Landing and Rock river. That there is also delineated on said map and upon the east bank of Rock river an area or strip of land extending from block 59 on the south to block 46 on the north, and which is bounded on the east by Turtle street, and marked "Public Landing." That the street delineated upon said map as lying between blocks 46 and 47 is marked thereon "Public Avenue," and widens from the west line of Pleasant street westerly, and in accordance with the bearing of the south line of block 46,—that is to say, measured by the scale of that map, Public avenue on the west line of Pleasant street is 74 feet wide, and the width of Public avenue on the west line of block 47 projected northerly across that avenue to block 46, is 144½ feet.

(3) September 26, 1839, Crane, by warranty deed duly executed, conveyed to one Selva Kidder, all of block 47 in the village of *Beloit,* "and for a more full description of the same" reference was therein "had to the recorded map of said village," which was the Doolittle map mentioned; and that deed was recorded September 27, 1839.    May 14, 1840, Crane and wife conveyed lots 1 and 2 in block 46, as designated on the Doolittle map, to one Phillip Kearney; being all the lands in that block abutting on Public avenue.

· (4) July 28, 1840, Crane, owning lands in fractional lots 6 and 7, and Bicknell and White, owning adjoining lands on the east and north, filed in the register's office another plat of said fractional lots and adjoining lands, which plat is marked "Map of Beloit," and made by John Hopkins, and embraces the same lands as the Doolittle plat and additional lands owned by White, and indorsed thereon is the certificate of Hopkins as county surveyor that the descriptions and plat were correct; and also the certificate of Crane, Bicknell, and White, as owners and proprietors, to the effect that they had

caused the lands to be so surveyed, platted, and described therein in good faith, and in the belief that the same were correct; that at the same time Crane and Bicknell certified in the presence of witnesses that they had caused the Doolittle plat to be made, the description of which was returned in blocks only, and that they had then caused this additional survey into lots to be on the same principle of the Doolittle survey, and that all former and subsequent descriptions of lots and blocks would be found explicit and correct by the Hopkins plat and description; and the same was acknowledged by Crane, Bicknell, and White August 6, 1840, and by them recorded August 16, 1840.

(5) That in making and recording the Doolittle plat and the Hopkins plat, Crane, intended to dedicate to the public all streets delineated thereon, and within fractional lots 6 and 7, including Turtle or State street, Public avenue, Pleasant street, and School street.

(7) That at the time of making the Doolittle plat—March 18, 1839—one Caleb Blodgett was residing on the south side of block 47, in a dwelling house extending across the south line thereof, as shown on that map. That the lots and blocks shown upon that map, so far as occupied, were at first, and for many years thereafter, fenced to keep out animals running at large. That until 1842 there was no bridge across Rock river in the village, and so during that time the river was crossed at a ford reached from the westerly end of Public avenue by crossing the north end of Public Landing. That such use by the public was continued for more than fifteen years after the making of the Doolittle plat. That in 1842 a toll bridge across the river was built by a private company, which was reached by the public at the southeasterly end by crossing the south end of Public Landing. That prior to October, 1841, block 47 was fenced. That the line of occupation on the north side thereof, as it existed in 1841, has continued from that time to the time of the trial

without any change. That the south line of block 46, as then occupied, was also marked by a fence built prior to October, 1841; and that Public avenue west of Pleasant street, as marked by the fences constructed prior to that time, angled from the west line of Pleasant street to the north, as mentioned above. That prior to 1843 there was built upon the southwest corner of block 47 a frame hotel, called the "Rock River House," which remained as first located until 1853, when it was removed by the owner to the northwest corner of block 47, and fronted on Public avenue, where it still remains, except the part destroyed by fire in 1898. That upon such removal a brick building was constructed on the southwest corner of that block, which remained as located in 1853 to the time of the trial.

(6 and 7) That in 1846 Blodgett began to occupy this brick house located on the north half of lots 7 and 8 in the northeast corner of block 47, which still remains and is now owned by the defendant *Greene*. That the premises so occupied by Blodgett were fenced on the east and on the north and along the present lines of occupation. That a row of trees was planted along the north fence thereof, and about six feet therefrom, some of which are large and still remain. Along the fence on the south line of lot 1, block 46, prior to 1841, a row of trees was planted, which still remain and are very large. The south line of occupation of lot 1, block 46, as first established, was continued without change until 1870, when E. P. King, who then owned that lot, moved that fence south to a line located and defined by ordinance known as "No. 39," (11) adopted on his petition on September 5, 1870, and that such fence remained upon the line so defined until 1883, when King moved such fence south to within twenty eight feet of the sidewalk on the northwest corner of block 47.

(6) That in August, 1868, the title to lot 1, block 46, became vested in E. P. King, father of the plaintiff, by mesne conveyances from Kearney, to whom Crane conveyed the

same May 14, 1840, as mentioned. That upon the death of E. P. King and wife and their daughter Mary the same title became vested in the plaintiff. The north half of block 47 having been divided into lots 7, 8, 9, 10 and 11, numbered consecutively from east to west, lots 7 and 8 became vested in the defendant *Greene,* before the commencement of this action, by mesne conveyances through Fuller and Blodgett from Kidder, who obtained the title to that block from Crane September 26, 1839, as mentioned, Crane having obtained in the meantime a patent from the United States of all of the land so conveyed by him May 9, 1842; and the title to the north part of said lots 9, 10, and 11 became vested in part in the defendant *Voorhees* and in part in the defendant *Burdge* by mesne conveyances from Kidder, who obtained title to the block as mentioned.

(8) Pursuant to "a petition signed by L. G. Fisher and sixteen others, whose names are not of record or known," the supervisors of the town of Beloit signed an order August 3, 1850, purporting to lay out a highway in Turtle street between block 47 and the Public Landing mentioned; also a highway extending from Pleasant street west on Public avenue to the west line of Turtle street (being the easterly line of the Public Landing), and bounded on the south by the north line of block 47, and on the north by a line parallel therewith and one chain and eleven links therefrom, and declaring therein that the same was intended to be in conformity to the original survey made by Doolittle of Turtle street and Public avenue.

(9) That on September 2, 1852, Crane gave to Stephen T. Gardner a quitclaim deed of so much of the street and Public Landing as is bounded on the south by a line running from the river east on the north line of block 59 of Doolittle's plat and east on that line projected to the center of Turtle street, thence northerly up the center line of that street to the center of Public avenue, thence northerly on the center line of Tur-

tle street to the south line of block 46, thence west on said line to the river, thence down the river to the place of beginning, which description includes lands marked "Public Landing" on Doolittle's plat. That prior to the giving of that quitclaim deed Crane made no claim of any right, title, or interest in the Public Landing, and made no objection to the use of the same by the public. That from the time of giving that quitclaim deed to Gardner Crane never had any right, title, or interest in or to such Public Landing, or any part thereof, and in or to blocks 46 or 47 of Doolittle's plat, and in or to Public avenue west of Pleasant street; and that all such right, title, and interest had been transferred by him by making and recording the Doolittle plat and the conveyances to Kidder, Kearney, and Gardner, mentioned. That May 18, 1854, this court, reversing the judgment of the trial court, held that Gardner could not recover in ejectment any portion of the Public Landing, for the reason that the Doolittle and Hopkins plats were neither of them ever acknowledged and certified as required by the statutes, and hence did not constitute a statutory dedication. *Gardner v. Tisdale,* 2 Wis. 153.

(10) That on January 22, 1855, Crane, having no right, title, or interest in or to any part of fractional lots 6 and 7 aforesaid, gave a quitclaim deed of the same to Cooper. That in January 26, 1855, Cooper gave a deed of the same to Demmon, and in April, 1855, Demmon and Cooper, respectively, gave quitclaim deeds of the same to Paul Dillingham. That Dillingham obtained no right, title, or interest in or to any part of said lands by virtue of such conveyances to him, and had no interest therein in 1855. That Dillingham procured a survey, plat, and map to be made by Rice of said fractional lots, and the same was recorded August 6, 1855, and known as the "Rice Plat." That Rice certified the same to have been made at the request of the proprietors who wished to lay out a town, and the same was acknowledged by the attorney

in fact of Paul Dillingham and wife.  The Rice plat changed
the numbers of some of the blocks as marked on the Doolittle
and Hopkins plats, including blocks 46 and 47, and gave dif-
ferent measurements and bearings for the boundary lines of
block 47.   It also designated a strip of land between Turtle
street—a little north of School street—and the end of the
bridge, mentioned in the seventh finding as Bridge street,
and it included all that part of Public Landing lying be-
tween block 46 on Doolittle's plat and the northeasterly line
of Bridge street, with a triangular lot carved out of the north
half of Public avenue, as designated on the Doolittle plat, and
marked the whole thereof as "Block 50," which block 50 in-
cludes all of Public avenue except a strip sixty-six feet in
width for a street along the north side of block 47 on Doo-
little's plat, as resurveyed by Rice.   That, as stated, at the
time Rice made that survey and plat, lot 1, block 46, belonged
to a person through whom the plaintiff claims title, and the
lots in block 47 abutting on Public avenue belonged to per-
sons through whom the defendants respectively obtained title,
and the same were occupied by them as stated.   That Gardner
died in 1862, leaving a widow, Sarah E., as his heir at law,
and she subsequently married Stratton, and June 11, 1869,
she conveyed to E. P. King so much of such new block 50 as
includes Public avenue as designated on the Doolittle plat;
and that at that time the line of occupation on the north side
of Public avenue was the same as it had always theretofore
been; and the line of occupation on the south side of Public
avenue was the same as it had always theretofore been and is
now.   That in January, 1856, while J. J. Bushnell was the
owner and in possession of lots 9, 10, and 11 of block 47 on
Doolittle's plat, Dillingham gave him a quitclaim deed there-
of, and Dillingham also gave to L. G. Fisher a quitclaim deed
of lots 1, 2, and 3, block 46, on Doolittle's plat.

(11) That in 1899 the plaintiff commenced the erection
of a building, the south line of which is within Public avenue,

which was subsequently completed at a cost of $1,150. That thereafter she erected a similar building just east of the first one, the front or south lines of which are some thirty feet or more south of the center line of Public avenue as the same was fenced out prior to 1841, and thereafter for many years used by the public. That she has kept and maintained said buildings as so located by her within Public avenue, and a barn just west of the first building erected, together with a fence from the southeast corner of the east building easterly to Pleasant street, and still maintains the same in said street. That the erection and maintenance of said buildings and fence by the plaintiff greatly interferes with the use of said street, and lessens the value of the lots in block 47, Doolittle's survey, on the south side thereof.

And as conclusions of law the court found, in effect, that the buildings and fences erected and maintained by the plaintiff in said Public avenue constitute an unlawful encroachment and obstruction therein; that the plaintiff has no lawful right to continue to maintain the same therein; that she is not entitled to any judgment against any of the defendants; that the defendants, and all of them, are entitled to judgment against the plaintiff, dismissing her complaint, with costs; that the defendants the city of *Beloit* and *R. J. Burdge* are entitled to judgment under their counterclaims compelling the plaintiff to remove all buildings and fences now maintained by her lying south of ordinance line No. 39 and east of the west line of Turtle or State street, as now located, extended northerly to said ordinance line No. 39.

From the judgment entered thereon accordingly, the plaintiff brings this appeal.

For the appellant there were briefs by *Ruger & Ruger,* and oral argument by *Wm. Ruger.*

For respondent city of *Beloit* there was a brief by *John C. Rood;* for respondents *Burdge* and *Greene,* a brief by *Jackson & Jackson;* and oral argument by *Mr. A. A. Jackson* and *Mr. Rood.*

CASSODAY, C. J. The questions presented in the voluminous record include some which are necessarily preliminary to the principal question, which, as stated by plaintiff's counsel, is as to where the lawful boundaries of Public avenue are located.

1. It is conceded that Crane entered all the lands in controversy November 26, 1838, but that he did not get any patent therefor from the United States until May 9, 1842. The question recurs whether, upon obtaining and recording that patent, the deed which Crane had given to Kidder September 26, 1839, and the deed which he had given to Kearney May 14, 1840, vested in the respective grantees therein named the title to the lands therein described. This question was answered in the affirmative by this court nearly fifty years ago. *Dillingham v. Fisher,* 5 Wis. 475, 478. In that case Fisher claimed title under the same deed from Crane to Kearney as here, and obtained judgment in the trial court, and the same was affirmed in this court. Id. 482. It was there held, in effect, that, although the strict legal title remained in the United States until the issuance of the patent, yet, as Crane had entered the land and paid his money and obtained the register's certificate of purchase, the entire equitable title and interest vested in him, and the same passed by his deed to Kearney, in whom the legal title became vested by way of relation, immediately upon the patent being issued. The principle upon which that decision was based has frequently been recognized by this court. *Cornelius v. Kessel,* 58 Wis. 237, 16 N. W. 550; *Paige v. Peters,* 70 Wis. 178, 182, 35 N. W. 328; *Spiess v. Neuberg,* 71 Wis. 279, 283, 284, 37 N. W. 417. It is in harmony with the decisions of the supreme court of the United States. *Wilcox v. Jackson,* 13 Pet. 498, 517; *Carter v. Ruddy,* 166 U. S. 493, 17 Sup. Ct. 640. The title to lot 1, block 46, as designated on Doolittle's plat, which so became vested in Kearney, afterwards by mesne conveyances from him and by operation of law became vested in the plaintiff before the commencement of this

action. Upon the same principle the absolute title to block 47—as designated on Doolittle's plat—became vested in Kidder as soon as the patent was issued; and thereafter by mesne conveyances from him and operation of law so much of that block as abutted on Public avenue as designated on that plat became vested in the defendants *Voorhees, Burdge,* and *Greene,* respectively, before the commencemnt of this action. Thus it appears that at the time the patent was issued Crane had parted with all right, title, and interest in and to any and all lands so conveyed to Kearney and Kidder respectively.

2. It becomes important to determine as to what right, title, or interest, if any, Kearney and Kidder, respectively, acquired by virtue of such deeds and patent to the space between blocks 46 and 47 as designated on the Doolittle plat. As indicated in the statement of facts, Crane and another caused the Doolittle plat to be made and recorded September 24, 1839—two days prior to the deed to Kidder, and more than eight months prior to the deed to Kearney. Each of those deeds purported to convey certain lands as designated on the Doolittle map. About three months after the deed to Kearney, Crane and two others caused the Hopkins plat to be made and recorded as stated. May 18, 1854, this court held that those plats were both void as statutory dedications to the public of the "Public Landing" described therein for want of the requisite acknowledgment and certification thereof. *Gardiner v. Tisdale,* 2 Wis. 153, 185. That was an action of ejectment commenced in November, 1852, to recover a part of the "Public Landing" described on such plats as being bounded on the south by block 59, on the east by Turtle street and Public avenue, on the north by block 46, and on the west by Rock river, as designated on the Doolittle plat, by virtue of a deed executed by Crane to Gardner September 2, 1852, more than ten years after the title became vested in Kidder and Kearney, respectively, as mentioned. The

judgment in that case was reversed for error, and the cause was remanded for a new trial; but there is nothing in the opinion nor the facts in that case having any bearing upon any of the questions here involved, unless it be inferred from the ruling to the effect that the original owner of a public landing, or those claiming under him, could maintain ejectment against a trespasser who constructed a permanent building thereon inconsistent with such public use. In pursuance of that decision, we shall assume, for the purposes of this appeal, that neither the Doolittle plat nor the Hopkins plat constituted a statutory dedication. But as stated in effect by a prominent text-writer, an incomplete or defective statutory dedication may be sustained as a common-law dedication, and if the streets or roads marked thereon are accepted by the public, they will become public highways.

"So, even where there is no acceptance on the part of the public, they will be regarded as ways, and will be kept open for the benefit of those who have purchased lots with reference to the location and existence of the streets and roads represented upon the maps or plats. And the right passing to the purchaser is not the mere right that he may use the street, but that all persons may use it." Elliott, Roads & S. (2d ed.) § 114.

Numerous cases are cited in support of such propositions. We only mention a few, in which there was an absence of any statutory dedication: *Rusk v. Berlin,* 173 Ill. 634, 50 N. E. 1071; *Bartlett v. Bangor,* 67 Me. 460; *Hurley v. Miss. & R. R. R. Co.* 34 Minn. 143; *Bissell v. N. Y. C. R. Co.* 23 N. Y. 61; *Carter v. Portland,* 4 Oreg. 339; *Meier v. P. C. R. Co.* 16 Oreg. 500, 19 Pac. 610; *McCall v. Davis,* 56 Pa. St. 431; *Transue v. Sell,* 105 Pa. St. 604; *Ferguson's Appeal,* 117 Pa. St. 426, 11 Atl. 885. Thus, in the Illinois case cited, it was held that:

"Where, after platting land, the owner sells lots and blocks with reference to the streets therein described, both he and his grantees are estopped to deny the legal existence of such

streets, although there is not a sufficient statutory dedication, owing to the plat not being properly acknowledged. The right of abutting owners to have a public street remain open is not merely that they may use the same, but that all persons may use it as a public highway, free from all claim or interference of the original proprietor, or those claiming under him, inconsistent with such use."

In the case cited from Maine it was held, in effect, that, where the owner of land sells one or more lots by reference to a plan made by him, he thereby annexes to each lot sold a right of way in the streets, which neither he nor his successors in title can interrupt or destroy. In the Minnesota case cited it was held that the "dedication of streets and public places, properly designated upon the plat of a survey of a tract of land into lots and blocks, is to be deemed complete upon conveyances being made of lots with reference to such plat, though it be not properly certified for record." In the New York case cited it was held that:

"As between grantor and grantee the conveyance of a lot bounded upon a street in a city carries the land to the center of the street. . . . So held where the conveyance contained no reference to the street by name, but the lot was described by its number, 'according to an allotment and survey made by E. J.,' upon whose map the lot was represented as abutting upon a street, and the depth of the lot was stated by figures which would not include any part of the street."

In the first of the Pennsylvania cases cited it was held that:

"When an owner of ground lays it off into town lots, with streets, etc., for their use, and sells lots accordingly, it is a dedication of these ways to the use of the purchasers. The plan exhibited is evidence of the existence and location of the streets, and when the deed refers to the plan it is made part of the description, and has the same effect as if copied into the deed."

The last case cited is to the same effect, and it also held that the dedication of the street to the use of the purchaser as a public way was complete, although the street had not yet

been opened. See, also, *Quicksall v. Philadelphia,* 177 Pa. St. 301, 35 Atl. 609, and *Farnsworth v. Taylor,* 9 Gray, 162. The rulings of this court, in so far as they have a bearing upon the question, are in harmony with the adjudications cited. *Fleischfresser v. Schmidt,* 41 Wis. 223; *Jarstadt v. Morgan,* 48 Wis. 245, 4 N. W. 27. In this last case it was held that:

"When the owner of the land laid out into blocks and lots bounded by what are represented, on an unrecorded or defective plat, as streets, conveys a lot, referring in the deed to the plat as containing the true description of the premises, his grantee takes, as against the grantor and his assigns, to the center of the street upon which the lot abuts. So held in a case where the deed referred to the plat as 'on record,' and it was in fact recorded, though not entitled to record."

So in a later case it was held that:

"If the owner of land plats the same into lots and streets and sells a lot designated upon such plat for a consideration affected by its location upon a street, also marked upon such plat, he is estopped, although the plat is not recorded, from depriving the purchaser of the use of such street." *Donohoo v. Murray,* 62 Wis. 100, 22 N. W. 167.

See, also, *Andrews v. Youmans,* 78 Wis. 56, 47 N. W. 304. Mr. Dillon states the rule thus:

"While a mere survey of land, by the owner, into lots, defining streets, squares, etc., will not, without a sale, amount to a dedication, yet a sale of lots with reference to such plat, or describing lots as bounded by streets, will, as between the grantor and grantee, amount to an immediate and irrevocable dedication of the streets, binding upon both vendor and vendee." 2 Dillon, Mun. Corp. (4th ed.) § 640.

"A distinguishing difference between a statutory and common-law dedication is said to be that the former operates by way of a grant, and the latter by way of an estoppel *in pais,* rather than by grant." Elliott, Roads & S. (2d ed.) § 115; 2 Dillon, Mun. Corp. (4th ed.) § 628; *Fulton v. Mehrenfeld,* 8 Ohio St. 440; *Pittsburg, C., C. & St. L. R. Co. v. Crown Point,* 150 Ind. 536, 550, 50 N. E. 741.

Since the deed given by Crane to Kearney of lots 1 and 2 in block 46 described the same as being on the Doolittle plat, there would seem to be no escape from the conclusion that Kearney, as an abutting owner on Public avenue, by virtue of that deed and the patent, acquired title to the center of that avenue subject only to the public easement and the rights of the city therein. And since Kidder, by virtue of the deed from Crane and the patent, obtained title to block 47 as described on the Doolittle plat, he thereby, as such abutting owner on Public avenue, acquired title therein to the center of that avenue, subject only to the public easement and the rights of the city. Of course, such rights in Public avenue passed to the respective grantees of Kidder and Kearney and the successors of each unless they were interrupted or diverted after they so acquired their title.

3. The question recurs whether Kearney or Kidder or those claiming under them respectively, lost or parted with any of the rights so acquired by them in Public avenue. One of the principal claims that such rights were lost or parted with is based upon deeds given by the original owner, Crane, subsequently to the time when such titles became vested in Kidder and Kearney, respectively, as mentioned. One of such deeds was given by Crane to Gardner September 2, 1852—more than ten years after such title became so vested in Kidder and Kearney. That deed only purported to convey land in Public Landing, as marked on the Doolittle plat, all of which was west of Turtle street and west of Public avenue, as marked upon that plat. The mere fact that this court held in the *Gardiner Case* (*Gardiner v. Tisdale*, 2 Wis. 153) that, if the proofs should be sufficient to warrant the same, ejectment might be maintained against a mere tres-passer, or one claiming no right or title in the part of the landing there in question except naked possession, is no ground for holding that those who derived such title from and under Kidder to the lands abutting upon Public avenue

lost or parted with the same by virtue of that conveyance.
Eight months after this court had held in that case that the
Doolittle and Hopkins plats were both void as statutory dedi-
cations to the public of "Public Landing," described thereon,
Crane gave a quitclaim deed to Cooper of all the lands so en-
tered by him, and four days afterwards Cooper gave a deed
of the same to Demmon, and three months after that Dem-
mon and Cooper gave quitclaim deeds of the same to Paul
Dillingham. Dillingham thereupon caused a survey, plat, and
map to be made by one Rice, which was recorded August 6,
1855, known as the "Rice Plat," which changed the numbers
of some of the blocks, including blocks 46 and 47, as desig-
nated on the Doolittle and Hopkins plats, and gave different
measurements and bearings for the boundary lines of block
47, and carved out of that part of Public Landing north of
block 59 and so much of Public avenue as lies west of Pleas-
ant street and is more than 66 feet from block 47, as desig-
nated on the Doolittle plat, a new block, and marked the
same thereon as "Block 50." August 23, 1855, Dillingham
deeded that block 50 to Gardner, and on the same day deeded
lots 1, 2, and 3 of block 46, as designated on Doolittle's plat,
to L. G. Fisher. In 1869 the widow of Gardner conveyed to
the plaintiff's father, E. P. King, so much of such new block
50 as includes a portion of Public avenue, as designated on
the Doolittle plat, and the plaintiff acquired title under that
conveyance. The trial court held that at the time Crane so
quitclaimed to Cooper he had no right, title, or interest in
or to any part of the land therein described; that Dillingham
obtained no right, title, or interest in or to any of the lands
therein described by reason of the conveyances mentioned,
and that he did not own any interest therein in 1855; that
at the time of the Rice survey and plat lot 1, block 46, on
the Doolittle plat, belonged to Rachel Fisher, and the lots in
block 47 of that plat, abutting on Public avenue, belonged to
Daniel Blodgett and J. J. Bushnell, under whom the respect-

ive defendants claim title; that at that time the whole of Public avenue from the south line of block 45, as then and theretofore occupied, to the north side of block 47, which was occupied the same as at the time of the trial, was in open and in constant and daily use by the public. Certainly neither Crane nor any one claiming under him through his deed to Gardner of September 2, 1852, or his deed to Cooper of January 22, 1855, ever got any right, title, or interest in or to any of the space between blocks 46 and 47 on Doolittle's plat, for the simple reason that at the time of giving those deeds, respectively, Crane had no right, title, or interest in such space which he could convey to any one. The same is true as to the subsequent deeds to and from Dillingham.

4. It is claimed that the right, title, and interest which Kidder, and those claiming under him, acquired in the space between blocks 46 and 47 of the Doolittle plat, as indicated, were largely extinguished and narrowed by action of the public authorities. Reliance seems to be placed upon an order signed by the supervisors of the town of Beloit August 3, 1850, purporting to lay out a highway in Turtle street between block 47 and the Public Landing, and also a highway extending from Pleasant street west on Public avenue to the west line of Turtle street, and bounded on the south by the north line of block 47, and on the north by a line parallel therewith and one chain and eleven links therefrom, and declaring therein that the same was intended to be in conformity to the original survey made by Doolittle of Turtle street and Public avenue. Public avenue east of Pleasant street is described on the Doolittle plat as being one chain and eleven links in width, whereas west of Pleasant street there is thereon an open space, the east end of which is 74 feet wide and the west end thereof is 144½ feet wide. That order was based upon a petition signed by L. G. Fisher and sixteen others, whose names are not of record or known. Assuming that such order, based upon such petition so signed, was effectual

for any purpose—which seems to be questioned—then it is important to determine for what purpose and to what extent it was so effectual. Counsel for the plaintiff say that by such order "the supervisors relocated Doolittle's lines for Public avenue in accordance with his plat, as they understood it, and accepted a strip one chain and eleven links wide adjoining the north side of Doolittle's block 47, and thereby waived such rights, if any, as the public had, to accept a greater width." It is stated by Mr. Elliott that:

"In order to make a dedication complete on the part of the public *as well as the owner,* and to charge the public corporation having jurisdiction over highways with the duty to repair the way, there must be an acceptance of the dedication by the public or the proper local authorities. . . . Until there has been an acceptance, the public cannot be charged with the duty of repairing, nor is there any liability for injuries caused by the defective or unsafe condition of the way." Elliott, Roads & S. (2d ed.) § 150. See cases there cited.

In another section he says that:

"It may now be considered as the prevailing opinion that an acceptance may be implied from a general and long-continued use by the public as of right." Id. § 154.

In the opinion of the trial court it is stated, in effect, that the space between the two blocks "was used by the public for travel to its full width down to 1870, or over thirty years; and for the greater part of its width down to 1883, or over forty years." The evidence seems to fully justify such statement. Such long-continued use by the public generally was certainly sufficient to justify an acceptance by the public of the dedication made by recording the Doolittle plat as of right.

We have already shown that the Doolittle plat and the conveyances according to the descriptions on that plat to Kidder and Kearney, respectively, was a complete dedication as a public highway of the space between blocks 46 and 47, irrevocable as against Kidder and Kearney and those claiming

under them, respectively: At most, the order of the supervisors was only effectual to limit the duty of the town to keep in repair and safe condition for travel the strip of ground therein described. Certainly, the order could not have the effect to destroy the rights which Kidder and Kearney and those claiming under them acquired as abutting owners upon Public avenue. It is well settled that such rights in the highway constitute rights of property of which the owner is not to be deprived without compensation. *Indianapolis v. Croas,* 7 Ind. 9; *Rensselaer v. Leopold,* 106 Ind. 29, 5 N. E. 761; *Story v. N. Y. E. R. Co.* 90 N. Y. 122; *Moose v. Carson,* 104 N. C. 431, 10 S. E. 689; *Pearsall v. Eaton Co.* 74 Mich. 558, 42 N. W. 77; *Lathrop v. Racine,* 119 Wis. 461, 473, 97 N. W. 192, and cases there cited. The order of the supervisors made no attempt to vacate any portion of Public avenue, nor to destroy the rights of such abutting owners or the public in any portion of the space between the two blocks in question. As stated by counsel for the plaintiff, the common council of the city, in passing Ordinance No. 39, September 5, 1870, "acted on the theory that Public avenue embraced all land between the south line of Doolittle's block 46 and the north line of his block 47. Among other things showing this," say counsel, "is the fact that the council assumed to vacate, as being a part of Public avenue, land lying north of the line described in the ordinance, ignoring the action of the supervisors in 1850 relocating Doolittle's lines for Public avenue," as mentioned, "and also ignoring the fact that the land which they assumed to vacate was a part of Rice's block 50, which the ordinance line cut in twain." What has been said as to the effect of the order of the supervisors upon the rights of such abutting owners upon the space between the two blocks is equally applicable to the ordinance. As indicated, this is, in effect, conceded by counsel. We must hold that neither Kidder nor those claiming under him, as such abutting owners, lost any right, title, or interest in any of

the space between blocks 46 and 47 of Doolittle's plat by reason of the action of any of the public authorities.

5. This brings us to the question suggested by counsel, "Where are the lawful boundaries of Public avenue?" The complaint alleges, in effect, that the south line of Public avenue, between Turtle street and Pleasant street, as delineated on Rice's map, is fourteen feet north of the north line of block 47 as located and shown on Doolittle's plat and Hopkins' map; and prays judgment, among other things, that the lawful boundaries of Public avenue between the premises of the several defendants and the plaintiff, as therein stated, "are as delineated upon and shown and located by said Rice's map and notes of survey." In their brief counsel for the plaintiff go further, and claim that the trial court erroneously adopted as the south line of Public avenue "the irregular line indicated by the north side of old Rock River House and the old fence existing prior to October, 1841, which practically adopted" the line designated therefor in the city ordinance of September 5, 1870, already mentioned. Upon such basis counsel contend, in effect, that "the ultimate question" to be determined is whether thirty-eight and one half "feet shall be added to the width of the Doolittle block (47) at its west end" and eighteen feet shall be added thereto at its east end, "perforce of Ordinance 39, or of such fence and north side of old Rock River House." In other words, the claim seems to be that such fences and buildings, as so located, extended north over what would be the south line of Public avenue by an accurate survey a distance of from eighteen to thirty-eight and one half feet. Such claims of the plaintiff are manifestly based upon the supposed inaccuracies of the Doolittle survey and plat, and the supposed inaccuracies of the Hopkins survey and map, and the accuracy of the Rice survey and plat and subsequent surveys. Rice made no attempt to locate or relocate the original lines of Public avenue as designated on the Doolittle plat. On the contrary, he

made his survey and plat at the request of Dillingham, who, as already shown, claimed title to such avenue independent of and antagonistic to the title so acquired by Kidder and those claiming under him, and the title so acquired by Kearney and those claiming under him. Accordingly Rice attempted to change the boundary lines of Public avenue and Public Landing, and make a new block therein, and change the lengths and bearings of the boundary lines of block 47 as shown by Doolittle's plat and notes. The radical difficulty with such claims of the plaintiff is that the legal rights of those under whom the respective parties claim title became fixed and determined long before the making of the Rice survey and plat. As already indicated, the description of Public avenue between Turtle street and Pleasant street, and the lands abutting thereon, as contained in the Doolittle plat, were in legal effect embodied in the several deeds of the lands abutting upon that portion of that avenue. Such being the facts, it is very obvious, as held by the trial court, that the south line of Public avenue cannot be located according to the survey and plat made by Rice, but must be located, if at all, according to the survey and plat made by Doolittle. *Racine v. Emerson,* 85 Wis. 80, 86, 87, 55 N. W. 177; *Galesville v. Parker,* 107 Wis. 363, 366, 367, 83 N. W. 646; *Gilman v. Brown,* 115 Wis. 5, 91 N. W. 227. The Doolittle survey and plat were made and recorded nearly sixteen years prior to the Rice survey and plat. The Hopkins survey and plat were made and recorded a little less than a year after the Doolittle plat and fifteen years prior to the Rice survey and plat. The proprietors who made the Doolittle plat joined in making the Hopkins plat, and certified therein that they had so made the Doolittle plat, "the descriptions of which" had been "returned in blocks only," and that they had caused such "additional survey into lots to be made" by Hopkins "on the same principle of Doolittle's survey," and that "all former and subsequent descriptions of lots and blocks" would "be found ex-

plicit and correct by the plat and description" accompanying the same. Thus it appears that the Hopkins plat was supplemental to and in aid of the Doolittle plat. All the surveys appear to have started from the state line, and recognized as a landmark thereon the corner between sections 35 and 36. There is evidence tending to prove certain landmarks fixed by Hopkins practically corresponding with those fixed by Doolittle. The several surveys, however, differ in certain particulars as to bearings and distances. It seems to be conceded that Doolittle's survey is radically wrong in some particulars—as, for instance, the distance from the section corner mentioned to the quarter corner; and there is evidence tending to prove that the distance from the state line to the southwest corner of block 47 on Doolittle's plat, along the east line of Turtle street, is sixty-three links, or about forty feet, greater by the Hopkins survey than by the Doolittle survey; but that such difference is accounted for as being entirely in the block adjoining the state line, a considerable distance south of block 47, and that such difference on the west line of Pleasant street is only thirty-five links. Doolittle gives the dimensions of block 47 on his plat as being four chains and sixty-nine links on the north side adjoining Public avenue, five chains on the west side thereof, and an irregular line on the south side of the aggregate length of six chains and sixty-eight links, but fails to give the length of the line on the east side thereof, although it does give the west line of the block opposite as four chains and eight links. Hopkins divided that block 47 into lots—giving the dimensions of each. His survey gives the north side of the block as four chains and sixty-nine links, being the same as Doolittle's; the west side of the block as five chains, being the same as Doolittle's; the south side of the block as six chains and sixty-six links, being two links less than Doolittle's; and the east side of the block as four chains and twenty-seven links; and gives the width of Public avenue east of Pleasant street as one

chain and twenty-one links, instead of one chain and eleven links, as given by Doolittle. There is evidence tending to prove that in making such surveys of block 47 Doolittle and Hopkins each started from the same point, and were governed by the same landmarks. It appears from the evidence, and is in effect found by the trial court, that at the time of making the Doolittle plat one Caleb Blodgett resided in a dwelling house situated on the south side of block 47 and fronting on School street; that soon after the making of the Hopkins plat, and prior to October, 1841, there was constructed a fence all around block 47; that the line of occupation on the north side of that block, as it existed in 1841, had continued to the time of the trial; that prior to 1843 there was constructed upon the southwest corner of block 47 a frame hotel, called the "Rock River House," which in 1853 was removed to the northwest corner of the block, fronting on Public avenue, where it still remained; that in 1846 a brick house was constructed on the north half of two lots in the northeast corner of the block, which was fenced on the east side and on the north side and along the present line of occupation, and that a row of trees was planted along the north fence thereof, and about six feet therefrom, some of which are large and still remain; that prior to October, 1841, the south line of block 46 on Doolittle's plat was marked by a fence, and that along that fence prior to 1841 a row of trees was planted, which still remain, and are very large; and that the south line of occupation of block 46 so established continued without change until 1870, when E. P. King moved that fence to a line located and defined by Ordinance No. 39, mentioned; and that such fence remained upon that line until moved still further south by King in 1883. Thus it appears that for more than forty years prior to 1883 the north side of block 47 of Doolittle's plat, as located upon the ground and actually occupied by the owners thereof, was recognized and acquiesced in by all as the south line of Public

avenue; and it continued in actual use as the south line of that avenue down to the time of the trial, a period of more than sixty years. Relying upon that as the true south line of the avenue, fences were built, sidewalks were laid, trees were planted, and buildings were constructed with reference to that line as the south line of Public avenue. Such practical construction of that portion of the Doolittle plat, continued for so many years, is entitled to great weight in determining the true location of that line. *Madison v. Mayers,* 97 Wis. 399, 410, 73 N. W. 43. The plan of the street, as so practically located, is not to be frustrated by failure to prove just where Doolittle located the corners of the block upon the ground, nor by reason of some supposed inaccuracy in his survey as to the bearings of the west line of the block, or the length of the east line of the block, or other inaccuracies in his measurements. It is said by a learned writer on the subject that:

"A plat which sets apart highways to the public is equivalent to a conveyance, and the easement conveyed is irrevocable. The lines as exhibited on the plat may control the explanatory notes. The extent of a dedication by map or plat is to be determined from a consideration of the whole instrument, since the chief object is to ascertain the intention of the donor. . . . The cardinal rule of construction is that which prevails respecting ordinary grants, and that is to discover and give effect to the intention of the party as manifested by his acts." Elliott, Roads & S. (2d ed.) § 119.

Numerous cases are cited in support of such statements. Here we not only have the plat of block 47 and Public avenue, but conveyances of the lands as described on the plat. This court, after holding that courses and distances are to be controlled by fixed monuments, held long ago that:

"If no monuments, are mentioned or in existence, evidence of long-continued occupation, though beyond the given distances, is admissible. If the description is ambiguous or doubtful, parol evidence of the practical construction given

by the parties by acts of occupation or recognition of monuments or boundaries is admissible." *Racine v. J. I. Case Plow Co.* 56 Wis. 539, 14 N. W. 599.

So it has been held that a finding fixing the line of a street is

"Sustained by evidence that the street was originally located on such line more than thirty years ago, and has been maintained thereon ever since, although a recent survey tends to show that another line is the true one." *Koenigs v. Jung,* 73 Wis. 178, 40 N. W. 801.

See, to the same effect, *Racine v. Emerson,* 85 Wis. 80, 55 N. W. 177; *Madison v. Mayers,* 97 Wis. 399, 410, 73 N. W. 43; *Galesville v. Parker,* 107 Wis. 363, 366, 367, 83 N. W. 646.

In this last case the plat was imperfect and contradictory. There were no landmarks or original stakes, except the quarter corner at the extremity of the plat, several blocks distant, unconnected by monument or description. The width of some of the streets was not given, and the corners and distances were inconsistent with each other. And it was held, in effect, that "the lines of ancient fences and long-continued occupation of adjacent lots and blocks in the same plat" had "greater probative force than mere measurements of courses and distances." The principles of law governing these adjudications are certainly applicable to the case at bar. Obviously, the trial court followed them in deciding this case.

6. Counsel for the plaintiff contend that the trial court erroneously adopted the line designated in Ordinance No. 39 as the north line of Public avenue. This is put upon two grounds: first, that the ordinance was void for noncompliance with the city charter; and, secondly, if otherwise valid, it was an unlawful interference with the plaintiff's land. It is enough to say that we have already shown that the plaintiff had no right, title, or interest in any portion of block 50 on Rice's plat, carved out of Public Landing and Public avenue, upon which her claim is based, nor to any such interest in

any portion of that avenue as would authorize her to obstruct the same against the protest of the defendants. The plaintiff, claiming that the north line of the avenue should be located still further south, is therefore not prejudiced by such location. None of the defendants having appealed from the judgment, it becomes unnecessary to consider the question further. We find no error in the record.

*By the Court.*—The judgment of the circuit court is affirmed.