LAWLER, Respondent, vs. BRENNAN and others, Appellants.

*October 27, 1911—January 9, 1912.*
*April 27—June 4, 1912.*

*Towns: Action by town board must be at meeting: Highways: Tunnels: Right to construct: Channel connecting with lake: Location of highway on lake: Evidence: Rights of abutting owners.*

1. Where an act, such as the granting of a permit, must be done by a board, the action must be taken at a meeting at which all members of the board are present or of which all have had proper notice.

2. Thus, a written permit, purporting to grant to a landowner the right to construct a ditch or channel across a highway for the purpose of connecting his lands east of the highway with a lake lying to the west thereof, is of no validity where no such action was taken at a meeting of the town board, although such permit was signed individually at different times and places, by all members of the board.

3. Upon the evidence in this case, stated in the opinion, including records, subsequent surveys, and testimony as to practical location, it is *held* that the highway upon which plaintiff's lands abut on the east extends to a lake on the west, and that he owns no land on the west side thereof and hence has neither a common-law nor a statutory right to construct a tunnel or channel under or across the highway.

BARNES and MARSHALL, JJ., dissent.

APPEAL from a judgment of the circuit court for Walworth county: A. J. VINJE, Judge. *Reversed.*

The plaintiff is the owner of a strip of land fronting on Lake Geneva. A highway passes across said land adjacent to said lake. Plaintiff is a dealer in ice, and, being desirous of building an ice house on his land, and of digging a channel from such ice house to said lake so as to convey the ice therein, applied to the town board of the town of Linn, in which said land was situated, for permission to dig such ditch across the highway and construct a bridge over the same, and at the same time presented to said board for its approval certain plans for the proposed ditch. The town board denied the right of plaintiff to construct any ditch across said highway and threatened to prevent him from so doing. Whereupon plaintiff commenced this action to enjoin the board from interfering with him in constructing such ditch. The defendant answered, denying the right of the plaintiff to intersect said highway with a ditch, and set up certain facts by way of counterclaim and secured an injunction enjoining the plaintiff *pendente lite* from interfering with the highway. Upon the conclusion of the trial of the action the court held that plaintiff, as the owner of the fee in the highway subject to the easement, had the right, under reasonable restrictions and regulations, to construct the proposed ditch across said highway, and prescribed the conditions under which the ditch should be constructed. From the judgment entered in plaintiff's favor defendants appeal.

For the appellants there was a brief by *Simmons & Walker, Charles S. French,* and *Thomas M. Kearney,* and oral argument by *Mr. Kearney* and *Mr. John B. Simmons.* They contended, *inter alia,* that the public is entitled to the full and free use of all the territory embraced within a highway to its full length and breadth, not only for traveling but for all the purposes that are legitimately incident thereto, such as the laying of drains therein, taking the soil therefrom for

purposes of repair, and the doing of any act therein con-
ducive to the public health, comfort, or necessity that does
not diminish or impair the travel thereon. Elliott, Roads
& Streets (2d ed.) § 645; Angell, Highways, § 226; *John-
son v. Whitefield,* 18 Me. 286; *Hart v. Mayor,* 9 Wend.
571; *Goodrich v. B., C. R. & N. R. Co.* 103 Iowa, 412, 72
N. W. 653; *Gregory v. Comm.* 2 Dana, 417; *Stetson v.
Faxon,* 19 Pick. 147; *Barker v. Comm.* 19 Pa. St. 412;
*Gunter v. Geary,* 1 Cal. 462; *Radcliffe's Ex'rs v. Mayor,*
4 N. Y. 195; *Snyder v. Rockport,* 6 Ind. 237; *Gassler v.
Georgetown,* 6 Wheat. 593; *Harrower v. Ritson,* 37 Barb.
301. Therefore "any permanent structure or pourpresture
which materially encroaches upon a public street and im-
pedes travel is a nuisance *per se* and may be abated notwith-
standing space is left for the passage of the public." *State
v. Berdetta,* 73 Ind. 185; *Pettis v. Johnson,* 56 Ind. 139;
*Comm. v. Blaisdell,* 107 Mass. 234; *People v. Vanderbilt,*
28 N. Y. 396; *State v. Woodward,* 23 Vt. 92; *Hibbard, S.,
B. & Co. v. Chicago,* 173 Ill. 91, 50 N. E. 256; 1 Wood,
Nuisances (3d ed.) §§ 251, 260, 262; *Driggs v. Phillips,* 103
N. Y. 77, 8 N. E. 514; *Att'y Gen. ex rel. Holtz v. Heishon,*
18 N. J. Eq. 410; *Smith v. State,* 23 N. J. Law, 130; *State
v. Atkinson,* 24 Vt. 448; Angell, Highways, § 223; *Goodrich
v. B., C. R. & N. R. Co.* 103 Iowa, 412, 72 N. W. 653;
*Cohen v. Mayor, etc.* 113 N. Y. 532, 21 N. E. 700, 4 L. R.
A. 406. See, also, *Bybee v. State,* 94 Ind. 443, 48 Am. Rep.
175; *Tilly v. Mitchell & L. Co.* 121 Wis. 1, 98 N. W. 969;
*Field v. Barling,* 149 Ill. 556, 37 N. E. 850; *Reimer's
Appeal,* 100 Pa. St. 182; *Snively v. Washington Tp.* 218
Pa. St. 249, 67 Atl. 465, 12 L. R. A. n. s. 918; *Pemberton
v. Dooley,* 43 Mo. App. 176. Not only would the channel
which plaintiff proposed to construct across and within the
limits of the public highway in question be a nuisance at
common law and preventable under the statute, but it was
the duty of the town of Linn to prevent the construction or

maintenance of such a nuisance and to keep its highways in a reasonably safe condition for travel by night as well as by day. *Draper v. Ironton,* 42 Wis. 696; *Stilling v. Thorp,* 54 Wis. 528, 11 N. W. 906; *Vass v. Waukesha,* 90 Wis. 337, 63 N. W. 280; *Johnson v. Highland,* 124 Wis. 597, 102 N. W. 1085. And as the official representatives of the town and as its officers, the defendant supervisors were charged with the duty of causing such encroachment and obstruction of the way to be summarily removed. *Neff v. Paddock,* 26 Wis. 546; *Hubbell v. Goodrich,* 37 Wis. 84. Sec. 1346, Stats. (1898), was designed for the purpose of facilitating the use of land on one side of a highway with land on the other, and cannot be strained so that it will apply to the flotation of ice from a navigable or public water not belonging to the proprietor nor within his boundaries on either side to an ice house constructed some distance inland. *Morse v. Buffalo F. & M. Ins. Co.* 30 Wis. 534; *Wis. Cent. R. Co. v. Smith,* 52 Wis. 140, 8 N. W. 613; *Jensen v. State,* 60 Wis. 577, 19 N. W. 374; *State v. Goodrich,* 84 Wis. 359, 54 N. W. 577; *State ex rel. Lederer v. Inter-National Inv. Co.* 88 Wis. 512, 60 N. W. 796. They also discussed at some length riparian rights; what they are and to whom they belong,—citing many cases.

For the respondent there was a brief by *Fred Kull, Burr W. Jones,* and *J. L. O'Connor,* and oral argument by *Mr. O'Connor* and *Mr. Jones.* They argued, among other things, that plaintiff was simply exercising a property right; that in the exercise thereof he was not unreasonably interfering with the public easement with which his property is burdened; that the defendants threatened to interfere with him in excess of their lawful authority and under color of office; and that this action may be maintained without waiting for an overt act of interference on the part of the defendants. Spelling, Injunctions, § 612; *Flood v. Van Wormer,* 147 N. Y. 284, 41 N. E. 569; *Elsheimer v. Niagara Falls,* 17 App.

Div. 618, 44 N. Y. Supp. 1116; 16 Am. & Eng. Ency. of Law (2d ed.) 361; High, Injunctions, p. 5, § 4; *Vicksburg W. W. v. Vicksburg*, 185 U. S. 65, 22 Sup. Ct. 585; *Pueblo & A. V. R. Co. v. Board of Comm'rs*, 5 Colo. App. 129, 38 Pac. 112, 114; *Flanders v. Wood*, 24 Wis. 572; *Miller v. Hoeschler*, 121 Wis. 558, 99 N. W. 228; *Church v. Joint School Dist.* 55 Wis. 399, 13 N. W. 272; *Uren v. Walsh*, 57 Wis. 98, 14 N. W. 902; *Joseph Schlilz B. Co. v. Superior*, 117 Wis. 297, 93 N. W. 1120. Even if plaintiff were divested of his riparian rights, still he may make such use of the soil of the highway for pleasure or for profit as he may deem necessary, not inconsistent with the public easement. As to the estate of an abutting owner in a rural highway, see 1 Am. & Eng. Ency. of Law (2d ed.) 242; *Gardiner v. Tisdale*, 2 Wis. 153; *Andrews v. Youmans*, 78 Wis. 56, 47 N. W. 304; *Huston v. Fort Atkinson*, 56 Wis. 350, 14 N. W. 444; *Brickwell v. Hamele*, 57 Wis. 490, 15 N. W. 190; *Mariner v. Schulte*, 13 Wis. 692; *Pettibone v. Hamilton*, 40 Wis. 402; *Goodall v. Milwaukee*, 5 Wis. 32; *Milwaukee v. M. & B. R. Co.* 7 Wis. 85; *Krueger v. Wis. Tel. Co.* 106 Wis. 96, 102, 81 N. W. 1041; *Tucker v. Eldred*, 6 R. I. 404; *Goodtitle v. Alker*, 1 Burr. 133; *Barclay v. Howell's Lessee*, 6 Pet. 498, 513; *Cole v. Drew*, 44 Vt. 49, 8 Am. Rep. 363; *Kincaid v. Indianapolis N. G. Co.* 124 Ind. 577, 24 N. E. 1066, 19 Am. St. Rep. 113; *Consumers' G. T. Co. v. Huntsinger*, 14 Ind. App. 156, 39 N. E. 423; *Pemberton v. Dooley*, 43 Mo. App. 176; Washburn, Easem. & Serv. (3d ed.) 228; *Harrison v. Brown*, 5 Wis. 27, 31; *Old Town v. Dooley*, 81 Ill. 255; *Tacoma S. D. Co. v. Chicago*, 247 Ill. 192, 93 N. E. 153; *Glencoe v. Reed*, 93 Minn. 518, 101 N. W. 956, 67 L. R. A. 901; *Rich v. Minneapolis*, 37 Minn. 423, 35 N. W. 2, 5 Am. St. Rep. 861; *Viliski v. Minneapolis*, 40 Minn. 304, 41 N. W. 1050; *Robert v. Sadler*, 104 N. Y. 229, 10 N. E. 428, 58 Am. Rep. 498; *Inhabitants of Woburn v. Henshaw*, 101 Mass. 193, 198; *Adams v. Emerson*, 6 Pick.

57; *Story v. N. Y. E. R. Co.* 90 N. Y. 122, 161; *Coverdale v. Charlton,* L. R. 4 Q. B. Div. 104; *McCarthy v. Syracuse,* 46 N. Y. 194. Every abutting owner upon a highway has a lawful right to obstruct the public travel in a limited degree, and the absolute right to divert the public travel, for a reasonable time, while improving his own estate. *Hundhausen v. Bond,* 36 Wis. 29. See, also, *Chamberlain v. Enfield,* 43 N. H. 356; *Holden v. Shattuck,* 34 Vt. 336; *Palmer v. Silverthorn,* 32 Pa. St. 65; *Overman v. May,* 35 Iowa, 89; *Shawnee Co. v. Beckwith,* 10 Kan. 603; *Papworth v. Milwaukee,* 64 Wis. 389, 25 N. W. 431; *Suffield v. Hathaway,* 44 'Conn. 521, 26 Am. Rep. 483; *Jackson v. Hathaway,* 15 Johns. 447; 15 Am. & Eng. Ency. of Law (2d ed.) 419; *Perley v. Chandler,* 6 Mass. 454; *Highway Comm'r v. Martin,* 88 Mich. 115; *Pemberton v. Dooley,* 43 Mo. App. 176; *Gordon v. Peltzer,* 56 Mo. App. 599; *Groton v. Haines,* 36 N. H. 388; *Clay v. Hart,* 25 Misc. 110; *Dexter v. Riverside & O. Mills,* 15 N. Y. Supp. 374, 39 N. Y. St. Rep. 933; *McCarthy v. Syracuse,* 46 N. Y. 194; *Woodring v. Forks Tp.* 28 Pa. St. 355, 70 Am. Dec. 134; *Dygert v. Schenck,* 23 Wend. 445; *Phœnixville v. Phœnix I. Co.* 45 Pa. St. 135. The statutes of this state, either directly affecting the abutting landowners or defining the powers and duties of the town board, do not diminish the landowners' common-law rights. They also discussed the plaintiff's rights under sec. 1346, Stats. (1898), and the nature of riparian rights.

The following opinions were filed January 9, 1912:

BARNES, J. His Honor, Mr. Justice VINJE, tried this case while on the circuit bench, and is therefore disqualified from taking part in the decision on the appeal in this court. Justices SIEBECKER, KERWIN, and TIMLIN are of the opinion that the judgment of the circuit court should be reversed. Chief Justice WINSLOW, Justice MARSHALL, and the writer are of the opinion that the judgment appealed from should

be affirmed.   There being an equal division of the members of the court qualified to participate in the decision, as above indicated, the judgment of the circuit court must be affirmed.

*By the Court.*—It is so ordered.

TIMLIN, J.   This case is affirmed upon equal division between the six qualified members of this court.   Nevertheless I think it advisable to make a memorandum of the reasons which led me to vote for reversal.

In this case the plaintiff owned a piece of land about 400 feet in width abutting on the east side of a public highway. On the west side of this highway lies Lake Geneva, a meandered navigable body of water.

It was contended by the plaintiff and the court found that a narrow strip of the plaintiff's land extended west of the highway and between the western boundary of the highway and the waters of Lake Geneva.   The highway was sixty-six feet wide and skirted the lake for some distance.   The plaintiff desired to connect his land with the waters of the lake by a ditch across the highway and applied to the town board of supervisors for permission so to do, and that board refused permission by declining to take any action granting such permission.   The circuit court found that prior to the commencement of the action the defendants, who are the supervisors of the town of Linn, threatened to prevent the plaintiff from constructing and maintaining a tunnel or subway upon his land under said highway, and that a tunnel or subway constructed according to plans and specifications annexed to the findings and according to the findings would not unreasonably interfere with the public easement.   Conclusions of law and a judgment followed, the judgment perpetually restraining the defendants from in any wise interfering with the plaintiff in the construction or maintenance of said tunnel or subway or the use thereof, "provided, however, that the foregoing is conditioned as follows:   (A) That the plaintiff

shall at his own expense construct and maintain such tunnel or subway according to the plans and specifications hereto annexed, made a part of this judgment and marked 'Exhibit A,' and provided that in the construction and maintenance of said tunnel the plaintiff shall not in any manner interfere with or obstruct the travel upon said highway, or in any way injure or damage the same except in so far as it may be necessary and proper in the proper maintenance and construction of said specified tunnel or subway, and that in no event shall the height of the top of the floor of said tunnel or subway be more than two feet above the present grade of the macadamized portion of the present highway adjacent to said tunnel or subway, which shall be graded by the plaintiff on either side of said tunnel or subway, uniformly a distance of 100 feet for each two feet so raised; and provided further, that said plaintiff shall extend the width of the bridge over said tunnel or subway whenever the town authorities shall widen the macadamized highway approaching said tunnel or subway." Attached to the judgment is a plan or blueprint of the proposed bridge approved and authorized by the court to be constructed, the same being a duplicate of the plan or blueprint attached to the findings. This plan shows an open ditch fourteen feet wide with a depth in it of four and one-half feet of water, and a space between the water level and the overhead planking of the bridge of thirty inches. The bridge is to be of steel and concrete. It is given in front view and cross-section and is twenty-eight feet in width east and west or across the traveled part of the road and carries on its east and west sides a concrete or stone fence or guard. At the place proposed for this crossing of the highway the ground is level, and the fill of the highway is not over two feet above the natural level on either side.

This is called a tunnel or subway. It is in fact an open ditch sixty-six feet in length, fourteen feet wide, and four and one-half feet deep extending clear across the highway,

with the middle twenty-eight feet thereof, corresponding in width to the graded portion of the highway, covered by an ordinary bridge. It seems to be called a tunnel or subway for the purpose of bringing the case within sec. 1346, Stats. (1898), which provides:

"Any person owning land lying on both sides of any highway is hereby authorized to construct a tunnel under such highway, also the necessary fences for the passage of stock, and other purposes, to and through the same, in such manner as will not interfere with or endanger travel on such highway. All such tunnels shall not be less than twenty-five feet in length and shall be maintained by the person constructing the same, and the owner of such property shall be liable for all damages which may be occasioned by reason of the failure to keep the same in repair; provided, that the electors of any town at an annual town meeting may by vote authorize the construction of any designated tunnel therein of the length of not less than sixteen feet. The chairman of every town shall see that all tunnels in his town are made in accordance with the provisions of this section and that they are kept in good repair."

It was not the purpose of the plaintiff to construct any tunnel. He wished to dig a ditch across the highway fourteen feet wide and of sufficient depth to permit him to float ice from Lake Geneva across the highway to his ice house situated on the east side of the highway, and to construct a bridge over this ditch to accommodate the public travel along the middle or traveled portion of the highway. Manifestly he is in no wise aided by the tunnel statute above quoted, for the sufficient reason that this is not a tunnel. This ditch remains open the whole width of the highway, except that the twenty-eight middle feet thereof are spanned by the bridge in question.

I think under sec. 819, Stats. (1898), which provides that the supervisors shall have charge of all the affairs of the town not by law committed to other officers; by sec. 1223, which provides that the supervisors of the several towns shall have

the care and supervision of all highways and bridges therein, and that it shall be their duty to appoint town superintendents of highways, who shall under their direction construct and repair all highways and cause all obstructions to be removed therefrom, and empowers the supervisors to require the superintendents of highways from time to time to perform any of the duties required of the latter by law; authorizes the supervisors to assess the highway taxes, to divide their town into highway districts, and to lay out and establish highways; and by secs. 1224, 1225, and 1226 and other sections to exercise control over highways, the town supervisors have the decision of such matters. Sec. 1339 makes the town liable in damages for injuries caused by defects in the highway, and sec. 1330 authorizes the supervisors to order encroachments removed, and sec. 1326 orders their subordinates who act under their direction to cause obstructions to be removed. Consequently the supervisors in this state have and exercise by law a discretion in the matter of allowing such a ditch as here described to be constructed in the highway, and that discretion is not reviewable by the circuit court. I believe that under such statutes the law is correctly stated in *McCarthy v. Pennsylvania L. & I. Co.* 5 Pa. Super. Ct. 641, as follows:

"The control of streets or roads and the grades and changes made thereon are not to be determined by the abutting owners, but are by statute placed under the control of the local municipal authorities. It follows that an abutting owner has no right to take possession of a public road or street and change its grade without authority from the body having it under statutory control."

See, also, *Snively v. Washington Tp.* 218 Pa. St. 249, 67 Atl. 465, 12 L. R. A. n. s. 918; *Bybee v. State,* 94 Ind. 443; *Congreve v. Smith,* 18 N. Y. 79; *Lansing v. Smith,* 8 Cow. 146; *Comm. v. King,* 13 Met. 115. None of the other cases brought to our attention relative to the title of an abutting

owner in the highway subject to the public easement touch this question. I concede this title of such owner. Numerous *dicta* are quoted to us to support the judgment of the court below, but they are all beside the question. The case illustrates the prevalent vice of trying to build up law by a series of quotations detached from the subject matter under investigation in the instances in which the quoted language was employed. By all well considered precedents the public interest is paramount to that of the abutting owner. He holds subject to that public interest and statutes regulating it. I find it adjudged in *Davis v. Pickerell,* 139 Iowa, 186, 117 N. W. 276, that the landowner who has exercised the right granted by the supervisors and constructed a cattle-way under the highway cannot abandon the same and construct another at a different location without new action of the supervisors. This was adjudged under a statute which permitted the board of supervisors to grant the right to construct a cattle-way across, over, or under any public highway, and perhaps loses some force because of this form of the statute. The instant case depends in this respect upon the construction of our statutes, and if our statutes commit the care and control of the highways to the local boards of supervisors, it follows that any one invading and disturbing the surface of that highway or making excavations therein which might interfere with the public use of the highway between its boundaries, or cause liability of the town for damages, must obtain the consent of the administrative officers in control. The courts cannot give this consent. The power is by law lodged elsewhere and is discretionary. It will scarcely be claimed that the courts are authorized to award this judgment specially to *Mr. Lawler.* If not, then every abutting owner may cut the level highway by a ditch and build a bridge over the ditch as a matter of legal right, provided he can convince a court that such action will not seriously interfere with public travel. Each of *Mr. Lawler's* neighbors along this road

can do so. *Mr. Lawler* and each of his neighbors must cut through the beach which lies between ordinary high and low water mark, and which does not belong to him but to the state, in order to reach the navigable waters. The result is confusion. If I could imagine such power in the circuit court under our statutes this would be an improper case for its exercise. This power is not committed by law to the courts. Nor can the courts exercise administrative power, fix grades, approve plans, and regulate that which is given to other and different officers for regulation. The judgment herein is not a judgment but an exercise of administrative authority. The acts performed by the circuit court were administrative acts, as much so as laying out a highway, granting a saloon license, or fixing a plan for street railway tracks. It is not necessary to cite authorities in support of this proposition, but it is worthy of note that the jurisdiction which the circuit court, without any statutory grant of power, so easily assumed in the instant case was rejected and disclaimed by other courts even when the statute expressly conferred it. Such statutes were held unconstitutional as attempting to confer administrative power on the courts. *Norwalk St. R. Co.'s Appeal,* 69 Conn. 576, 37 Atl. 1080, 38 Atl. 708, 39 L. R. A. 794; *Moynihan's Appeal,* 75 Conn. 358, 53 Atl. 903; *Spencer's Appeal,* 78 Conn. 301, 61 Atl. 1010; *Beard's Appeal,* 64 Conn. 526, 30 Atl. 775; *Smith's Appeal,* 65 Conn. 135, 31 Atl. 529; *Ives v. Goshen,* 65 Conn. 456, 32 Atl. 932; *Nash v. Glen Elder,* 81 Kan. 446, 106 Pac. 292. This is the rule of the federal courts also.

One of the grounds upon which Sir EDWARD COKE was removed from the office of Chief Justice of England was his interference by judicial decisions with the administrative duties of the commissioners of sewers. Chief Justice MOUNTAGUE, who succeeded him, was upon his appointment to that office admonished in the quaint style of those days to hear causes with patience; bear with the prolixity and impertinent

discourse of lawyers; ensue the good and eschew the evil examples; and to imitate the virtues of his worthy grandfather, Sir EDWARD MOUNTAGUE, who never vaunted that he would make *latitats latitare;* nor arrogated to himself the high title of Capitalis Justitia Angliæ; nor devised new constructions of laws against the commissioners of sewers, "disputing of tricks and moote points concerning taxes, and making new gutters or walls." Moore, 825 *et seq.*

I come to this conclusion on the hypothesis that *Lawler* owned a narrow strip of land west of the highway and between that and the waters of Lake Geneva. But I will add further that I have carefully examined the evidence as to such ownership, and I think it is shown almost to a demonstration that *Lawler's* land does not at the place in question extend west of the highway as laid out.

The appellants moved for a rehearing.

In support of the motion there was a brief by *John B. Simmons* and *Charles S. French,* attorneys, and *Thomas M. Kearney,* of counsel; in opposition thereto a brief by *Burr W. Jones* and *J. L. O'Connor.*

The motion was granted on March 12, 1912, and the cause was reargued on April 27, 1912.

For the appellants there was a brief by *Charles S. French, Simmons & Walker,* and *Thomas M. Kearney,* and oral argument by *Mr. Simmons* and *Mr. Kearney.*

*Burr W. Jones* and *J. L. O'Connor,* for the respondent.

The following statement of facts and opinion were filed June 4, 1912:

This is an action in equity brought by the owner of land bordering on the eastern end of Lake Geneva to enjoin the town supervisors of the town of Linn in Walworth county from hindering or preventing him from constructing a channel, or covered waterway, under and through a highway of the

town, and thus connecting the waters of the lake with the plaintiff's land on the east side of the highway. The first and fundamental question in the case is as to the correct location of the highway in question. It is admitted that it skirts the lake in front of the plaintiff's property, and the defendant supervisors claim that it extends to the eastern edge of the lake at ordinary high water, while the plaintiff claims and the trial court found that there is a strip of land or beach from twenty-five to thirty-five feet in width owned by the plaintiff between the west line of the highway and the eastern edge of the lake. It is admitted that if there be any land between the west line of the highway and the lake it belongs to the plaintiff.

The plaintiff makes three claims, viz.: (1) that he has the right to construct the channel or tunnel under a written permit alleged to have been given by the three supervisors of the town of Linn to one Dennison, plaintiff's predecessor in title, July 22, 1901; (2) that, inasmuch as the highway runs through his property, leaving part of his land on one side and part on the other, he has a common-law right to dig a ditch or channel across the highway and connect the two parcels by a waterway, building and maintaining such bridges as may be necessary to provide for public travel; (3) that he has a right to construct such a waterway under sec. 1346, Stats. (1898), which provides that "any person owning land lying on both sides of any highway is hereby authorized to construct a tunnel under such highway, also the necessary fences for the passage of stock, and other purposes, to and through the same, in such manner as will not interfere with or endanger travel on such highway."

The plaintiff desired to erect an ice house on his land east of the highway and wished to construct the channel from the lake across the highway for the purpose of floating ice from the lake to his ice house. Before bringing the action he presented to the defendant supervisors a communication claiming

the right to construct the way under the Dennison permit, and accompanied the communication with designs and specifications for two bridges across the traveled part of the highway, either of which he offered to erect, as the supervisors might deem best. The supervisors refused even to consider the request, and the plaintiff thereupon commenced this action and obtained a preliminary injunctional order from a court commissioner restraining the defendants from interfering with the construction of the channel, and commenced work thereon. Upon making answer to the complaint the defendants obtained an order to show cause why the plaintiff should not be restrained from proceeding with the work until the decision of the case on the merits, together with a temporary restraining order. By stipulation of the parties the *status quo* was allowed to remain during the pendency of the action. There was a contest upon the trial between surveyors as to the correct location of the highway, which it appears was originally laid out in 1839. The court found that there was in fact twenty-five feet of land belonging to the plaintiff between the highway and the edge of the lake, and held that the plaintiff was entitled to construct a tunnel or subway under the highway according to plans and specifications attached to the judgment and made part thereof.

The so-called tunnel or subway was in effect a bridge thirty-one feet wide over a water channel fourteen feet in width, extending across the highway. The bridge elevated the grade of the prepared way two feet, and the plaintiff was required to grade the highway 100 feet in each direction so as to bring it up to the proposed level of the bridge. The supervisors were enjoined from interfering with the plaintiff in the construction of the channel or tunnel, and from this judgment the defendants appeal.

WINSLOW, C. J. The reargument which has been had in this case has cast new light on the case, at least to the mind of

the writer of this opinion, and especially is this true with regard to the question of the location of the highway.

All the members of the court were convinced on the first hearing that no rights could be claimed under the so-called Dennison permit, and they are all of the same opinion now. There may be more than one good reason which can be given for this conclusion, but there is certainly one which is entirely sufficient, and that reason is that the permit was never granted at a meeting of the town board. The testimony shows without dispute that the members of the board signed it individually at different times and places, and that no action ever was taken at any meeting of the board, either regular or special. It is well settled that where an act must be done by a board the action must be taken at a meeting at which all are present, or of which all have had proper notice, in order to make the action binding. *McNolty v. Board of School Directors,* 102 Wis. 261, 78 N. W. 439; *Lisbon Avenue L. Co. v. Lake,* 134 Wis. 470, 113 N. W. 1099.

As has been said in the statement of facts, the initial and fundamental question in the case is the question of the location of the highway which skirts the eastern end of Lake Geneva and crosses the western end of the plaintiff's premises, which are 400 feet in width from north to south. The highway is frequently called the "beach road" by the witnesses, because it passes along the beach of the lake at only a slight elevation from the surface of the water for a distance of more than half a mile. If the western line of the highway reaches the edge of the lake in front of the plaintiff's premises he cannot successfully claim the right to construct the waterway and bridge in question, either under common-law principles or the provisions of the "tunnel" statute, because in either case it is necessary that the party claiming the right own property on each side of the highway.

The road in question was four rods in width, and is admitted to have been laid out in 1839. In May of that year a

petition for the laying out of a highway, commencing at the village of Geneva and running southerly to the Illinois state line, a distance of more than six miles, was presented to the commissioners of Walworth county,. and viewers were appointed who reported in October, 1839, in favor of the laying out of a highway pursuant to the petition, and accompanied their report with a map and survey made by a surveyor named Norris, who was also one of the viewers. The map and survey seem to have been accepted by the commissioners in the following January and ordered to be recorded, and the road was opened. The survey describes simply the center line of the highway and commences at the Illinois state line in the town of Linn at the southwest corner of section 35 in that town, proceeding thence north on the section line between sections 34 and 35 forty-six chains. It then diverges to the northeast through sections 35 and 26 to the southwest corner of section 24, thence north on the line between sections 23 and 24 one mile, between sections 14 and 13 one mile, and between fractional sections 11 and 12 nearly half a mile to a point four chains south of the quarter corner on the west line of section 12. From this point (which is designated by the letter A on the map on page 133) it proceeds in a general northeasterly direction around the east end of Lake Geneva, there being a change of course at each of the points marked on the map by the letters A, B, C, D, E, F, G, H, I, and K.

The changes of course at the points C, D, and E are so slight that upon a small map they are not very noticeable, but there is a substantial change at each place. It is quite evident from mere inspection of the map that from the point C to the point F there was a deliberate following of the shore of the lake for some reason. The courses D to E and E to F are north 4 degrees and north 9 degrees 15 minutes west respectively. There is, however, a narrow strip of land represented as intervening between the highway and the lake. The plaintiff's premises consist of a strip of land 400 feet in width from

north to south at the point D, 100 feet thereof being taken off from the south side of the southwest fractional quarter of section 1, and 300 feet thereof from the north side of the northwest fractional quarter of section 12.    The survey attached to the map states that the line of the highway terminates "on the beach of Geneva Lake at the confluence of Center street of Geneva village plat with the Racine road" (the point marked L upon the map).    It will be understood that the map herewith given is approximately a correct copy of that part of the map attached to the original survey which relates in any way to the present controversy, but that the letters A, B, C, etc., were not on the original map, but have been added for convenience of reference merely.

It appears by the testimony that in or about the year 1873 a considerable change was made in the north part of the highway.    All that part lying in section 36 was discontinued and closed up, as well as about twelve or thirteen chains in length of the north end of that part which lies in section 1, and the course of the highway was radically changed so that, beginning at a point nearly midway between the points G and H, it diverges sharply to the northeast and enters the village of Geneva on the south line of section 36, between eleven and twelve chains east of the south quarter-section corner of said section.    Since the original laying out of the highway in 1839 the same has been constantly in use and has for all that time been the principal and only reasonably direct highway connecting the town of Linn with the village of Geneva (now city of Lake Geneva).    None of the original monuments, stakes, or witness trees are now in existence.    The surveyors who were sworn for the plaintiff and those who were sworn for the defendants commenced their surveys at the point A, and substantially agree that it is correctly located in the middle of the present traveled track of the highway.    They also seem to agree that the first two courses of the road from A to C have been changed so that the road runs further to the west

Lawler v. Brennan, 150 Wis. 115.

than originally laid out.   There has also been a change of the
courses between F and G.   Mr. Teeple, a civil engineer who
made the principal survey for the plaintiff, testified that he
found the quarter-section corner on the west side of section 12
without difficulty, and commenced his survey at a point four
chains south of that point on the west line of section 12, which
line was practically the center of the highway as traveled.
Using this line as his meridian, he ran a random line over the
courses and distances named in the original survey of the road
to the point H, where the road enters section 36.   He found
on consulting his copy of the original survey that this point
was described as being 125 links east of the quarter-section
corner on the south line of section 36, and, finding no stake in
existence showing that corner, he proceeded to relocate the
same from a monument which he found on the southeast cor-
ner of the section.   From beginning to end of his random
survey he found no stakes nor bearing trees, but ran the en-
tire line simply by transit angles and checked by compass
readings.   On locating the quarter-section corner by measure-
ment from the southeast corner, he measured 125 links east-
ward from the corner so located and arrived at a point sixty-
two and one-half feet east of his random line location of the
point H.   He then swung the whole random line over to the
east, using the point A as the axis of the movement.   At H the
line was swung over sixty-two and one-half feet, and at the
intermediate angles between H and A the distance of the
swing eastward was determined according to the rules of pro-
portion used by surveyors in such cases.   Proceeding back
southward over the line to make the corrections at the various
angles, he found nothing in the way of witness or bearing trees
to corroborate his new line at G or F, but found what he
thought was the rotted remains of an oak stump near the
angle E at a point about seven feet to the east of where the
witness tree should be if the corrected line was right.   Deem-
ing this the witness tree named in the original survey, he then

swung the line seven feet further eastward at this point. At D he found some decayed roots of a tree in the swamp which he thought indicated that there had been a tree at a point about a foot or two from the location of the witness tree named in the notes, assuming that his corrected line was right. Not feeling certain of its exact location, however, he made no further change at D on account of the supposed witness tree, but used the new point at E to re-establish or correct the points D and C in the same manner that he had used the point H. He found no stakes or witness trees at B or C. The corrected line thus established by the witness Teeple is the line which the court found to be the center of the highway. In regard to this survey a number of facts, some of which appear from the evidence of Mr. Teeple himself, are pertinent. Mr. Teeple made no particular examination as to the lines of ancient occupation at any point along the route. At the point C his original random line is ten or twelve feet west of the center of the highway as traveled. From this point northward the random line runs more and more to the west of the traveled track and runs into the edge of the lake between E and F. At no place does he attempt to follow the line of the present traveled highway. At E the random line was moved thirty-six feet on account of the swing eastward made necessary by the change at H and the finding of the witness tree at E. At D the swing eastward was twenty-eight and one-half feet from the random line, and at C twenty-one and one-half feet. The corrected point E is somewhere from ten to fifteen feet east of the center of the present macadamized traveled track, which is about twenty-two feet in width. The corrected point D is about thirty-three feet east of the center of the present traveled track. From the south line of the plaintiff's land (400 feet south of D) to the north line of his land (100 feet north of D) Mr. Teeple's corrected line is continuously to the eastward of the entire roadway as traveled from time immemorial, the greatest distance being at D,

where it seems to be somewhere from seventeen feet to twenty feet. In determining the section line between sections 1 and 12 Mr. Teeple found a stone monument near the point D. This monument was set under the fence between the two sections to mark the dividing line between the two sections by a surveyor named Beckwith many years ago. Mr. Teeple's point D as corrected is four feet north and *one foot* to the west of that monument. This monument is about on the line of an old north and south fence extending about 150 feet northward from the south line of the plaintiff's property as well as upon the line of a well defined line of trees and bushes which taken together have for many years formed the apparent east boundary of the highway in front of plaintiff's property. For most of the distance between the south line of the plaintiff's land and the point F there is and always has been a low ridge running along the margin of the lake on which the traveled highway always has been located, and to the east of this low ridge is a marsh. It is claimed by the defendants that the point E as corrected is in fact in the marsh, and the point D either in it or close to its edge. While it does not seem possible to exactly verify this claim, it is entirely certain that both of these points fall considerably to the eastward of the ridge and either in the marsh or on its margin. We are unable to ascertain from the evidence how Mr. Teeple's corrected line agrees with the lines of occupation at G and northward, because he admits that he paid no attention to such lines, and we do not discover that he gave any testimony even as to the approximate line of occupation at this point. Finally Mr. Teeple says that which is quite manifest, namely, that after fixing the point H his entire subsequent survey depends for its accuracy on the manner in which that point was fixed.

The defendants' surveyors did not attempt to make so ambitious a survey as Mr. Teeple's. Mr. William Powrie, a civil engineer, testified that he started from practically the same point on the south as Mr. Teeple, using the west line of

section 12 as a meridian, and ran courses northward accord-
ing to the calls of the original survey. He also ran into the
edge of the lake at about the point E. He became satisfied
that there was a discrepancy somewhere from the fact that on
computation of the eastings in the original Norris survey
he found they amounted to but 38.73 chains up to the point H
on the north line of section 1, and yet, according to the sur-
vey, this point was 125 links east of the quarter-post. He
concluded that the last course on the survey, instead of being
"north 28 chains and 50 links to a stake 125 links east of the
quarter corner," was not due north, but "northerly" to the
point named. He then attempted to locate the north quarter
corner of section 1 by measuring forty chains west from the
northeast corner of the section, but the measurement brought
him into a grass plat in front of a residence where there were
no indications of stakes, or monuments, or bearing trees, and
no possibility of making search by way of excavations. From
his forty-chain point he measured to the lake in an attempt
to find the meander corner, and found the distance to be 5.29
chains, instead of 7.26 as stated in the original survey. He
concluded that it was impossible to accurately locate the point
H. He then concluded to survey that part of the road skirt-
ing the lake only, assuming that Norris made the original
survey using the true meridian as required by the United
States Statutes—Act of May 18, 1796 (1 U. S. Stats. at
Large, 464: R. S. of U. S. sec. 2395)—instead of the mag-
netic meridian (which, according to the note in the survey,
had a variation at that time of six degrees east). Carrying
out this idea, he took the proper observations on Polaris and
the sun, found the true meridian, located the angle at C by
this meridian, and found that point to be practically in the
center of the traveled track. He then ran the line according
to the notes of the original survey to the point F. This line
lay on the traveled track from C to a point about 725 feet
north of C, and about opposite the place where the channel is

to be located it diverges to the east of the traveled track for a distance of about 200 feet, the point D being about the middle of this last named stretch. At the point D the line so run is fifteen and one-half feet west of the stone monument on the east side of the road mentioned above in the description of Mr. Teeple's survey. At the north line of plaintiff's premises is another stone monument which is in line with trees and bushes apparently marking the east border of the highway, and Mr. Powrie's line is twenty-two feet west of the last named monument. As the line reaches the angle E it is exactly in the center of the traveled track, and at F is fourteen feet west of the center of the traveled track. Mr. Powrie was of opinion from the results obtained by him in using the true meridian that Mr. Norris used that meridian in his original survey.

Some pertinent facts are to be noted with reference to the Powrie survey. So far as concerns that part of the road which skirts the lake (and this is the principal part of the road which has never had its course changed by official action), it comes much nearer to the lines of actual travel which have existed from time immemorial than the Teeple line. At the only points where there are any monuments it agrees more nearly with them than the Teeple line. At the point E there was a small inlet into the lake when the original survey was made, and the notes of the original survey state that a stake was planted on the north back of the inlet. A small bridge was at once constructed at this point and retained for a good many years, but finally was moved south some distance and the channel filled up. It seems natural that the bridge should have been constructed in the right place, for the stake was doubtless then in existence, and, if so, then it seems quite certain that the traveled road at this point is in the right place, and the evidence is clear that Mr. Powrie's line is in about the center of the traveled road at E. Again, the Powrie line

at no point invades the swamp before spoken of, but follows the ancient ridge for practically the entire distance. .

There was another survey made by an engineer named Carlson, which agreed substantially with Mr. Powrie's, but adds nothing materially to the strength of Mr. Powrie's position. Mr. Teeple was assisted in his survey by a civil engineer named Haskins, whose testimony corroborates that of Mr. Teeple as to the manner of the survey, but adds nothing materially to it. Prof. L. S. Smith of the College of Engineering of the University of Wisconsin also consulted with Mr. Teeple after the latter's survey, and made examination as to the remains of witness trees at D and E, corroborating Mr. Teeple's claims as to the probable location of those supposed trees. He also corroborated Mr. Teeple as to the proper method of correcting a random survey when no monuments or stakes are to be found.

After all is said and done, however, it must be admitted, we think, that the evidence of the surveyors is not very satisfactory. Were it not for other facts now to be considered, we certainly should not feel called upon to interfere with the findings of the trial court. One important fact, however, has developed from examination of the exhibits since the trial and decision of the case below which would have presented quite a different question to the trial court. It was assumed from start to finish that the point H was located by Norris 125 links east of the quarter-section corner on the south line of section 36. Mr. Teeple's entire corrected survey is founded on this fact. It now appears that it cannot be determined whether the distance was 125 links or 1.25 links. The question is, Was there a decimal point between the 1 and the 2 or not? Two maps and surveys of the road were found to be on file in the office of the county clerk. Both seem to be originals, and they seem to be substantially identical, except that in one the point H is described as "125 links" east of the quarter corner, and in

the other very plainly as "1.25 links" east of the same corner. One is indorsed "Minutes of road in Geneva filed this 6th day of October, 1840, ordered to be recorded," with the word "recorded" below; the other is indorsed "Report of James A. Maxwell, Edward Norris, accepted this 7th day of Jan. 1840, ordered to be recorded." Both are dated October 24, 1839.

It is said by respondent that there is a description of the highway in the records of the county surveyor's office without a map which fixes the stake 125 links east of the quarter corner, but it is admitted that this was not introduced in evidence, although it was referred to by the surveyors in their evidence. Mr. Norris, it appears, was county surveyor when the survey was made. It is said by the respondent that the 1.25 is a palpable mistake; that no surveyor would make a line terminate a distance of 1.25 links, or about ten inches, from a quarter corner. In corroboration of this contention they point to another distance in the survey where the distance to a bearing tree is given as 151 links in one survey and 1.51 links in the other, and they say that no surveyor would measure such a distance as the hundredth of a link. They then suggest that the first document described was intended to correct the second. These considerations seem plausible, and there are others which might be named, but nevertheless we must face the fact that we do not certainly know which distance is correct. It may be more probable that 125 is correct, but it is not certain. This adds an element of confusion and doubt not present when the findings of fact were made, and what effect it might have had upon those findings we cannot know. The entire situation forcibly illustrates the danger of trying to relocate old lines by running courses and distances with no known monuments as guides. Mr. Teeple finds some remains of roots seven feet from where they should be, and he conjectures that they are the roots of the witness tree described as existing more than seventy years ago; Mr. Powrie finds the call of 125 links does not correspond with the statement of eastings, and he conjectures that

Mr. Norris used the true meridian instead of the magnetic; and now we are urged to conjecture that 125 is the true number of links rather than 1.25. This does not seem in any respect satisfactory. The principle is very familiar that resurveys of ancient lines by courses and distances, paying no attention to ancient occupation, is not a satisfactory method of arriving at the line. It has been correctly said that such surveys are entitled to little weight as against practical location of the line by fences or by occupation for a long series of years. If there be no original monuments in existence, but it appear that there has been occupation and that fences have been maintained for many years, it will be assumed that the lines of such occupation agree with the original occupation taken in accordance with the original survey soon after it was made while the stakes or monuments were in existence. This principle has been applied to highways as well as to lands privately owned. *Vernon v. Nicolai,* 125 Wis. 319, 103 N. W. 1111. It is a beneficent principle in that it makes for repose and settlement of rights, rather than for the reopening of acrimonious and expensive disputes with every new survey. It is a correct principle in that in the majority of instances it doubtless reaches results more nearly in accordance with the original survey than any other method.

In the present case we are convinced that there is such cogent proof of practical location of the highway in question in front of the plaintiff's premises that it must be held to overcome the testimony of the surveyors and settle the question adversely to the plaintiff's claim. Especially does this result seem inevitable in view of the fact of the uncertainty of the location of the point H, upon which the accuracy of the Teeple survey wholly depends.

The facts as to this practical location are substantially undisputed and the more important facts may be briefly summarized as follows: The highway is a main traveled thoroughfare by which the inhabitants of the entire country south of the lake approach the city of Lake Geneva, and has been such

ever since it was laid out. For about half a mile it skirts the
shores of Geneva Lake and has always been known as the
"beach road," because it lies but little removed from the beach
and only a few feet higher than the lake. As far back as any
witness can remember, and many were called whose memory
ran back thirty and forty or more years, the traveled way,
about twenty feet wide,. has existed along this half mile of
highway practically in the precise place in which it now is.
Twenty-five or thirty years ago it was thoroughly macadam-
ized by private enterprise, so that a roadbed twenty-two feet in
width, placed directly over the old track, has existed since
that improvement. There has never been any fence or evi-
dence of private occupation on the west side of this traveled
track in front of the plaintiff's premises, nor does it appear
that any one ever exercised any act of ownership there. There
has always been a grassy strip of ten or twelve feet next to the
traveled track, and then a beach varying in width from five or
six feet at ordinary high water to ten or twelve feet at extreme
low water. On the east side of the traveled track there has
likewise always existed a grassed space of from twenty to
thirty feet in width (the widest point being at D) which has
always apparently been a part of the highway. This space
in early days was bounded by a rail fence succeeded by others
of various kinds, which, while not making a mathematically
accurate line, have all been substantially at about the same
distance from the traveled track and at the edge of the grassy
strip. An old post and board fence still remains on this line
in front of the south 160 feet of the plaintiff's premises. The
grassy strip on the east side of the track has also been further
bounded on the east by a thicket of trees and shrubbery in
front of plaintiff's premises coming out to the line of the old
fence and by the marsh or slough further north toward the
point E. The only witness who testified as to the distance of
this old fence from the water in front of the plaintiff's prem-
ises stated that he measured the distance at the point D in
October, 1909, and found it to be eighty-one feet. He also

testified that at the place where the tunnel was begun it was seventy-two feet seven inches, and on *Mr. Lawler's* south line seventy-three feet. What the height of water was at the time does not appear, but presumably it was low. Thus it appears to be established beyond controversy that for an indefinite time in the past, probably well toward seventy years, there has been an open space of about four rods in width here, extending from the fence and thicket to the lake, having a twenty-foot traveled track near its center and bearing every appearance of an ordinary country highway for its full width, and further that no one has ever (until the present time) set up a claim to any part of the space as private property.

This seems to us very strong evidence of practical location of the highway, a location which ought not to be upset by a mere survey depending on courses and distances, especially when such survey is founded upon a conjecture as to the location of a controlling point.

Furthermore, it appears that over this entire open space of approximately four rods in width the public has always, so far as any one can remember, exercised the right of travel, diverging from the traveled track when it was heavy and driving either on the grass to the east, or on the grass or hard sandy beach on the west, also driving into the water to water horses or set wagon tires, and in winter driving on to the ice to seek a shorter route to town. These latter acts are not particularly persuasive in themselves alone, but in connection with the other evidence as to the appearance and use of the entire strip they help to give character to that use.

We are not unmindful of the fact that upon the original map there appears to be a strip of land between the road as laid out and the lake, nor of the fact that the center of the highway at the point H appears to be considerably more than 1.25 links east of the quarter-post. These are facts entitled to be considered, but we have been unable to consider them as at all controlling.

The great and overshadowing fact remains that for nearly

or quite three score years and ten there has existed a strip of land about four rods in width which has had every appearance of a highway, and has been used as a highway for its whole width, and which has never been claimed as subject to private ownership, but has had a boundary on the one side of a fence and on the other of a navigable lake.

We do not consider it necessary to split hairs as to the exact width of this strip.   At times when the water has been low it seems to have been a few feet more than four rods in width; at other times it has doubtless been less.   It is quite difficult, if not practically impossible, to fix the exact point of ordinary high water where the bed of the lake begins.   *C. Beck Co. v. Milwaukee,* 139 Wis. 340, 120 N. W. 293.   We regard the whole strip opposite the plaintiff's premises from the fence and thicket line westward to ordinary high-water mark as constituting the highway by practical location which has existed unchallenged for so many years that it would be unjust to the public to now change the lines because of surveys whose accuracy can never be demonstrated.

We hold, therefore, that under the evidence the plaintiff owns no land west of the highway, and hence has neither a common-law nor statutory right to a tunnel or channel under or across the highway.   This renders it unnecessary to pass upon any other questions presented.

*By the Court.*—Judgment reversed, and action remanded with directions to render judgment for defendants, dismissing the complaint with costs.

VINJE, J., took no part.

The following opinion was filed June 10, 1912:

TIMLIN, J.   The point covered by and decided in the opinion of the court written by Chief Justice WINSLOW is included in and part of the more comprehensive theorem ad-

vanced by Justices SIEBECKER, KERWIN, and the writer on the first argument. We all understand, I think, that where there are different, opposite, abutting owners, the title of each, subject to the public highway easement, extends to the center of the highway. But where one person owns abutting land on both sides of a highway, or where a person owns land abutting on one side of a highway, which highway extends in width from such land to or below ordinary high water of a navigable body of water, he owns all the land covered by the highway, subject to the highway easement. To the learned lawyer this note is entirely unnecessary; but there are others to whom it may be a benefit.

The following opinion was filed June 20, 1912:

BARNES, J. (*dissenting*). The conclusions reached by the court in this case are summarized in the final paragraph of the opinion, where it is said: "We hold, therefore, that under the evidence the plaintiff owns.no land west of the highway, and hence has *neither a common-law nor statutory right to a tunnel* or channel under or across the highway." (The italics are mine.)

I believe the decision is contrary to well settled principles of law and that the court in reaching its conclusion has overturned findings of fact made by the trial judge which were not only well supported by the evidence but were sustained by the decided preponderance of proof. I think the plaintiff was entitled to judgment independent of the tunnel statute and regardless of whether or not he owned land between the road and the lake. If the tunnel statute be held to confer a new right rather than to regulate the exercise of an existing one, then I think the plaintiff was entitled to relief under that statute because the proposed construction was a tunnel and the plaintiff did own land on both sides of the highway as well as the highway itself. The case is an important one,

and I cannot help thinking that the court has wandered far afield from long established legal rules in deciding it. The respective interests of the public and an abutting owner in the highway have been fixed by a well nigh uniform current of authority. Where the right of the public ends and that of the abutting owner begins, has been just as firmly established. Whenever a conflict arises between these two, there is always one and only one question to be determined, and that is, Does the use which the owner proposes to make of his property unreasonably interfere with the use and enjoyment of the public easement therein?

The plaintiff owns the fee in the highway and the public has a mere easement across his land. *Andrews v. Youmans,* 78 Wis. 56, 47 N. W. 304; *Wegge v. Madler,* 129 Wis. 412, 109 N. W. 223; *Smith v. Beloit,* 122 Wis. 396, 100 N. W. 877; *Brown v. Baraboo,* 98 Wis. 273, 74 N. W. 223; *Chase v. Oshkosh,* 81 Wis. 313, 51 N. W. 560; *Donohoo v. Murray,* 62 Wis. 100, 22 N. W. 167; *Pettibone v. Hamilton,* 40 Wis. 402. It is conceded that *Lawler's* land runs to the lake, so he owns the fee in the highway whether the lake forms its western boundary line or not.

The right of the public in a highway is well defined. It has the right of passage. It may cut down elevations, fill depressions, grade the roadway, and make reasonable use of the material which it finds on the right of way for construction and repair work. It may improve and fit for travel so much of the right of way as it sees fit, and prevent obstructions in or encroachments on the road that would endanger or materially interfere with travel. On the other hand, the owner of the fee has the right to use his land for all purposes consistent with the enjoyment of the easement acquired by the public. 37 Cyc. 207, and cases cited in note 1.

"The public have simply an easement, a right of passage along the highway, but not the right to make a pasture of the road. . . . And as a general rule in this state, the fee of the

highway belongs to the owner of the adjoining ground, subject to this easement or right of passage in the public." *Harrison v. Brown,* 5 Wis. 27, 31.

An individual has no right to pile wood along the unused portion of a highway against the protest of an abutting owner. "To establish any such right as incident to a public easement, would be a flagrant violation, not only of the rights of land-owners, but of the public also." *Orton v. Harvey,* 23 Wis. 99, 102.

The owner of a city lot, having an estate in fee to the center of the adjacent street, has a right to the enjoyment of any use of his estate, consistent with the servitude to which it is subjected. And where such owner has occasion to build thereon, he may lawfully unload his materials and earth within the limits of the street, taking care not to improperly obstruct the street, provided he removes such material within a reasonable time. *Hundhausen v. Bond,* 36 Wis. 29. To the same effect are *Gardiner v. Tisdale,* 2 Wis. 153; *O'Linda v. Lothrop,* 21 Pick. 292; *Clark v. Fry,* 8 Ohio St. 358; *Storrs v. Utica,* 17 N. Y. 104; *Chicago v. Robbins,* 2 Black (67 U. S.) 418.

The abutting owner has a right to use the subsurface of the street for legitimate purposes, provided such use does not interfere with the right of the public in the street. *Papworth v. Milwaukee,* 64 Wis. 389, 25 N. W. 431.

The correctness of these decisions of our own court has never heretofore been questioned. The principles thereby established are abundantly supported by the decisions of other courts.

The owner of the soil over which a highway is located is entitled to the entire use of the land, except the right which the public has to use the land and materials thereon for the purpose of building and maintaining a highway suitable for the safe passage of travel. And the public have no right to take materials from the right of way for any purpose other

than the building and maintaining of the same.    *Cole v. Drew,* 44 Vt. 49, 8 Am. Rep. 363.

The abutting owner is "entitled to the timber and the grass which may grow upon the surface, and to all minerals which may be found below it."    *Barclay v. Howell's Lessee,* 6 Pet. 498, 513.

The original owner "has a right to the freehold and to all the profits which may be derived from it, consistently with the right of passage of the public,—to all mines beneath the surface, to all trees, grass and pasturage upon and above the surface."    *Tucker v. Eldred,* 6 R. I. 404.

"The public acquires a right of way with the powers and privileges incident to that right, such as digging the soil, using the timber and other materials found within the limits of the road, in a reasonable manner, for the purpose of making the road and its bridges.    The former proprietor of the soil still retains the exclusive right in all the mines, quarries, springs of water, timber and earth, for every purpose not incompatible with the public right of way."    *Pemberton v. Dooley,* 43 Mo. App. 176.

A right of way existing in the public over land for a highway is a right of passage, and not a right to get water in the streams or springs on the soil of the landowner, and a spring in a public highway is not a part thereof, nor is its use an incident to the use of the road, and the landowner has a right to fence it off from the public use as long as the use of the highway is not thereby unreasonably interfered with.    *Old Town v. Dooley,* 81 Ill. 255; *Tacoma S. D. Co. v. Chicago,* 247 Ill. 192, 93 N. E. 153.

The abutting owner has the right to remove gravel from the right of way unless the material so taken is necessary for the construction or repair of such roadway, provided the roadway is not materially injured by removing such gravel. *Glencoe v. Reed,* 93 Minn. 518, 101 N. W. 956, 67 L. R. A. 901.

And where a city entered into a contract for street grading and permitted the contractor to clear and take away the rock found in the part of the street covered by the contract, it was held that the owner of the fee was entitled to recover the value of the rock so taken away, it appearing that it was not necessary to remove the rock for the purpose of grading or improving the street, it being located below the grade line. *Rich v. Minneapolis,* 37 Minn. 423, 35 N. W. 2.

The owner of the fee has a right to sell sand from a bed located on one side of the traveled road, provided no injury is done to the highway by such removal. *Williams v. Kenney,* 14 Barb. 629.

The building of a pipe line along a highway does not come within the use for which the highway was intended; the owner has the right not only to expel those who are engaged in the unlawful work, but also the right to tear up and remove the pipes which they have placed in his land. *Consumers' G. T. Co. v. Huntsinger,* 14 Ind. App. 156, 39 N. E. 423.

A contractor for the construction of a sewer is liable to the owner of the fee for the value of stone taken from a ledge in the street which it was not necessary to remove for the purpose of constructing the sewer. *Viliski v. Minneapolis,* 40 Minn. 304, 41 N. W. 1050.

Where the public authorities had piped water from a spring on the side of a highway to a public drinking trough, the abutting owner undertook to take up the pipes and was restrained from so doing by the town authorities. The court said that subject to the public easement the abutting owner "may take trees growing upon the land, occupy mines, sink watercourses under it, and generally has a right to every use and profit which can be derived from it, consistent with the easement, and when disseized (as he may be) can maintain ejectment and recover possession subject to the easement, and can also maintain trespass for any act done to the land not necessary for the enjoyment of the easement, which would be actionable injury if the land was not covered by the highway.

. . . In the case before us, as between the public and the respondent, the owner of the spring, the latter is entitled to any and all uses of it which do not interfere with the public safety, do not obstruct or hinder public travel, and do not increase the public burden of making repairs. If, therefore, the officers can at the same cost make and keep the way equally safe and convenient, and still allow the water to flow from the spring over and upon the land of the owner of it, it is their duty so to do. The right of the owner to the use of the spring under these limitations takes precedence of the right of the officers to divert it to the lands of others, if in so doing their sole motive is to establish a public watering place. Of course such places afford great relief to man and beast; but, commendable as is the act of establishing them, towns have no right to take private property without compensation for that purpose." *Suffield v. Hathaway,* 44 Conn. 521, 526, 527.

"When the sovereign imposes a public right of way upon the land of an individual, the title of the former owner is not extinguished; but is so qualified that it can only be enjoyed subject to that easement. The former proprietor still retains his exclusive right in all mines, quarries, springs of water, timber, and earth, for every purpose not incompatible with the public right of way." *Jackson v. Hathaway,* 15 Johns. 447, 452.

Other cases holding a like doctrine are *Chamberlain v. Enfield,* 43 N. H. 356; *Holden v. Shattuck,* 34 Vt. 336; *Overman v. May,* 35 Iowa, 89; *Board of Comm'rs v. Beckwith,* 10 Kan. 603; *Winter v. Peterson,* 24 N. J. Law, 524, 61 Am. Dec. 678; *West Covington v. Freking,* 71 Ky. 121; *Phifer v. Cox,* 21 Ohio St. 248; *Bolling v. Mayor, etc.* 3 Rand. (Va.) 563; *Highway Comm'rs v. Ely,* 54 Mich. 173, 19 N. W. 940.

Proceeding now to what might be termed cases directly in point, that is to say, cases where the foregoing principles were applied so as to give the abutting owner the right to construct ditches and carry watercourses in and across a highway, we find that they are uniformly to the effect that the

right exists, provided its exercise does not unreasonably interfere with the enjoyment of the public right.

The common-law right of an abutting owner to cut a ditch so as to carry a raceway across a highway is recognized and impliedly sanctioned in *President, etc. v. Mann,* 59 Wis. 69, 17 N. W. 972, where it is held that when such a channel is cut the owner of the raceway is liable for the maintenance of the bridge.

"The owner of the soil traversed by the highway had the right to construct a watercourse across it. . . . This familiar and well settled rule of law does not in our opinion grow out of the feudal tenure, or any peculiarity in the laws of England in relation to the duties of parishes, as argued by the defendant's counsel, but results, as we think, from the fact that the public right is a mere easement, and the owner of the soil, as such, can lawfully do anything upon it that does not interfere with the public easement." *Inhabitants of Woburn v. Henshaw,* 101 Mass. 193, 198.

To the same effect are *Perley v. Chandler,* 6 Mass. 454, and *Adams v. Emerson,* 6 Pick. 57.

The owner of land through which a public road runs may cut a passage across the road for the purpose of draining his land or running water to his mill, because the land is his own, but in doing so he must not injure the public easement, and to preserve it must construct bridges over such ditches where they cross the road and must keep the same in repair. *Woodring v. Forks Tp.* 28 Pa. St. 355.

Later it was held by the same court that the owner of land adjoining a highway may cut a ditch across the road, but he must, by bridging or otherwise, make the highway as safe for travel as before. *Phœnixville v. Phœnix Iron Co.* 45 Pa. St. 135.

The general rule is laid down in 15 Am. & Eng. Ency. of Law (2d ed.) 419, as follows:

"The owner of the fee may sink a drain or watercourse below the surface of the highway, or make any other excavation

therein, provided he takes proper precaution to cover it so as not to interfere with the safety and convenience of travelers."

The owner of land through which a highway passes may dig a ditch across such highway, but if he does he must by bridging or otherwise keep the highway as good and safe for travel as before. The court said the defendant certainly committed no trespass in digging the ditch.

"It was his own soil. The only right adverse to his was one to have a common highway for the purpose of travel. All the public could require was, that he should make and keep the road as good as it was before he dug his ditch. That he accomplished by building a substantial bridge originally, which did not get out of repair for a number of years. The road, however, in the end, proved to be less safe than it was when the bridge was first built, certainly less so than before the ditch was dug. In suffering this, the defendant came short of his obligation to the public." *Dygert v. Schenk*, 23 Wend. 445 (op. by COWEN, J.).

The owner of the fee in a public highway may sink a watercourse under it for use in connection with the adjoining premises where the highway is not thereby rendered unsafe. *Clay v. Hart*, 25 Misc. 110, 55 N. Y. Supp. 43.

The owner of the fee in a public highway may dig ditches therein to drain his lands, provided his acts do not render the highway less safe, useful, or convenient for the public. *Nelson v. Fehd*, 104 Ill. App. 114; affirmed in 203 Ill. 120, 67 N. E. 828.

"It is well established in this state, in conformity with the principles of the common law, that a highway is simply an easement or servitude, conferring upon the public only the right of passing over the land on which it is laid out, and, as an incident of such right, that of using the soil and the materials upon it in a reasonable manner for the purpose of making and repairing it. The title of the owner of the land is not extinguished, but is simply so qualified that it can only be enjoyed subject to the easement. He retains the fee and all rights of property in the land not incompatible with the

public enjoyment of the right of way, and whenever the highway is abandoned or lost, the entire, exclusive, and unincumbered enjoyment reverts to him. Subject to this right of the public he may take trees growing upon the land, occupy mines, *sink watercourses under it,* and, generally, has a right to every use and profit which can be derived from it consistent with the easement. . . ." *Woodruff v. Neal,* 28 Conn. 165.

The same question was before the South Carolina court, and it was held by that court that the abutting owner had the right to carry a conduit for water under the highway. *Baring v. Heyward,* 2 Speers (S. C.) 553.

The owner of a raceway adjoining a public street may lawfully increase the flow of water to his mills so long as the safeguards erected by the public remain sufficient. *State v. Society, etc.* 46 N. J. Law, 274.

Where a defendant was the owner of the land within the limits of a country highway, subject only to the public easement, and the land contained a valuable deposit of sandstone, defendant was not required to maintain the highway unobstructed to its full width so as not to interfere at all with the use of the highway for public travel as a condition of its right to remove the sandstone, but was only required to keep a passageway open and in good repair within the limits of the highway on the surface of the ground or by a bridge of width sufficient to enable teams to pass each other. *Clarendon v. Medina Q. Co.* 92 N. Y. Supp. 530, 1148.

Since the public has only an easement of use in a highway, and the fee rests in the abutting owner, he may make such use of the land within the highway as will not interfere with its use by the public. Such owner may use the highway on which to maintain irrigation ditches for the benefit of his land, provided he does so without creating a nuisance or interfering with its use as a highway. *Holm v. Montgomery,* 62 Wash. 398, 113 Pac. 1115.

The state of Oklahoma passed an act forbidding firms or

corporations to pipe natural gas outside of the borders of the state, and provided in the law that no pipe line intended for such purpose should be laid in or across any of the public streets or highways of the state. It was held that the act was void and that it was beyond the power of the state to prohibit the laying of pipes in the streets where they did not materially interfere with the public use, and that any such prohibition as was attempted would operate to deprive the abutting owner of property without due process of law. *Kansas N. G. Co. v. Haskell,* 172 Fed. 545, affirmed *West v. Kansas N. G. Co.* 221 U. S. 229, 31 Sup. Ct. 564. This case is very significant, because the legislature attempted to deprive the abutting owner of the right which the plaintiff sought to exercise here, and the court held the legislature had no such power.

I am at a loss to know upon what theory it is claimed that the abutting owner has no common-law right to construct a ditch in a highway simply because he does not own land on both sides of the road. So long as he confines his activities to the part of the highway which he owns in fact, he may make any lawful use of it which he sees fit, provided that by so doing he does not unreasonably interfere with the public use. To say that he cannot do this, is to deprive him of the use of his property without compensation and for a purpose that is not public. Admittedly the plaintiff owned the land over which the road was built to the ordinary high-water line. He had the right to construct his ditch to this point if by so doing he did not interfere with the public easement. Even if he were obliged to stop there, the ditch might be of great use to him in the transportation of ice to his ice house. He is denied the right to use his property to the ordinary high-water mark. This denial is not put upon the ground that the proposed ditch would materially affect the enjoyment of the easement of the public. The trial court found that it would not. This finding is not attacked in any way in the

decision of this court. It is amply sustained by the evidence. Every legitimate public interest has been carefully safeguarded by the judgment. The plaintiff was required to make his ditch safe and secure and to widen the concrete bridge whenever required to do so. He was also required to give a bond to keep the bridge perpetually in a good state of repair. In fact there is very little serious contention on the part of appellants' counsel that there would be any impairment of the use of the highway by the construction of the ditch. The town board did not refuse to grant the plaintiff the permission which he sought because it conceived that the use of the highway by the public would be affected by the ditch. The plaintiff's land is located near a number of very costly summer residences. An ice house in their midst would no doubt be something of an eyesore to persons of artistic tastes and temperaments. The town board elected to cater to these tastes rather than to the commercial and plebeian desires of the plaintiff. But the plaintiff purposed entering upon a perfectly legitimate business on his own property. He is precluded from exercising that right without a cent of compensation and without an iota of justification, as I view it.

I have stated that the plaintiff had a clear right to carry his ditch to the ordinary high-water line of the lake. Although the question is not very material, I do not for a moment concede that he was obliged to stop there. He had the right to cut the banks and connect his ditch with the lake, provided that by so doing he did not interfere with the public right of navigation or of hunting or fishing. The riparian proprietor on a navigable lake has certain well defined rights and privileges peculiar to himself, which extend beyond his boundary line and into public waters.

A riparian proprietor on a navigable lake

"has the right of exclusive access to and from the waters of the lake at that particular place; he has the right to build piers and wharves in front of his land out to navigable waters

in aid of navigation, not interfering with the public use. These are private rights incident to the ownership of the shore, which he possesses, distinct from the rest of the public. All the facilities which the location of his land with reference to the lake affords, he has the right to enjoy for purposes of gain or pleasure; and they oftentimes give property thus situated its chief value. It is evident from the nature of the case, that these rights of user and of exclusion are connected with the land itself, grow out of its location, and cannot be materially abridged or destroyed without inflicting an injury upon the owner which the law should redress. It seems unnecessary to add the remark, that these riparian rights are not common to the citizens at large, but exist as incidents to the right of the soil itself adjacent to the water. In other words, according to the uniform doctrine of the best authorities, the foundation of riparian rights, *ex vi termini*, is the ownership of the bank or shore. In such ownership they have their origin. They may and do exist though the fee in the bed of the river or lake be in the state. If the proprietor owns the bed of the stream or lake, this may possibly give him some additional right; but his riparian rights, strictly speaking, do not depend on that fact." *Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214, 226, 227.

The above quoted portion of the opinion is quoted and approved in the case of *McCarthy v. Murphy,* 119 Wis. 159, 161, 162, 96 N. W. 531, wherein it is held that the riparian owner had the exclusive right to build piers and wharves in front of his land in aid of navigation, and might remove as a private nuisance a pier erected by any other person.

"It is settled in this state that the riparian owner on navigable water may construct in front of his land, in shoal water, proper wharves, piers, and booms in aid of navigation, at his peril of obstructing it, far enough to reach actually navigable water. This is properly a riparian right, resting on title to the bank, and not upon title to the soil under the water. It is a private right, however, resting, in the absence of prohibition, upon a passive or implied license by the public, is subordinate to the public use, and may be regulated by law." *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534, 547, 67 N. W. 918; *Cohn v. Wausau B. Co.* 47 Wis. 314, 322, 2 N. W. 546.

One riparian owner, without legislative authority, "has no legal right to draw the water from such lake, to the injury of other such riparian proprietors thereon." *Priewe v. Wis. State L. & I. Co., supra.*

The right of the private riparian owner is subject to the paramount right of the public to navigate navigable waters. *Mendota Club v. Anderson,* 101 Wis. 479, 78 N. W. 185.

A riparian owner on Chequamegon Bay may build docks from his shore to the line of navigable water. *Northern P. L. Co. v. Bigelow,* 84 Wis. 157, 54 N. W. 496.

"Docks, wharves, and public landings are essential to navigation, and highly favored in the law. The defendant, as a riparian proprietor, may have had the right to construct this boom for his own benefit, if it had not interfered in such way with the free and unobstructed navigation of the waters of the lake. When it does so interfere with the private and public right of navigation, then it becomes a private and public nuisance to be abated, and those who place them or maintain them there are liable in damages for any special injury." *Union M. Co. v. Shores,* 66 Wis. 476, 479, 29 N. W. 243.

A riparian owner on the shores of a navigable inland lake whose property is valuable for pleasure resort purposes on account of its proximity to the lake and easy access to its waters for boating and fishing can maintain an action against other riparian owners for so drawing off the water of the lake as to lower its level. *Cedar Lake H. Co. v. Cedar Creek H. Co.* 79 Wis. 297, 48 N. W. 371.

Each owner of shore line on a navigable lake is entitled as against other owners to his proportion of the line bounding navigable water for contact with navigation, and to a direct course over intervening shallows to construct piers or other structures connecting the shore with such navigable line. *Thomas v. A., S. & I. R. L. R. Co.* 122 Wis. 519, 100 N. W. 993.

It would be illogical to hold that the riparian proprietor

could build a dock from his land to navigable waters but could not construct a ditch from the water to his land, where such construction would interfere with no public right.

The fact that one of the boundary lines of a highway is a navigable body of water does not affect the riparian right of the abutting proprietor who owns the soil in the highway, except in that the right of the public to the riparian privilege for public purposes incident to navigation and to navigable waters is paramount to the private riparian right. *Pewaukee v. Savoy,* 103 Wis. 271, 79 N. W. 436; *Bradley v. Pharr,* 45 La. Ann. 426, 12 South. 618, 19 L. R. A. 647.

It is well settled by the foregoing authorities, as well as by others, that the public and the abutting owners each own an estate in a highway, and that the estate of the abutter carries the fee and the exclusive right to use the same subject only to the public easement and what that easement carries with it. It is as well settled that the abutter cannot unreasonably interfere with the exercise of the public right. Whenever the abutter asserts a right and the public through its proper officers denies the existence of such right, we have a judicial controversy which is referable to the courts for decision. The public or its representatives can no more undertake to finally decide it than it could undertake to decide a dispute which might arise over the boundary line of a highway. It would be intolerable to permit one interested party to a controversy to make itself a court, judge, and jury to pass on its own case when its biased and partisan decision would operate to deprive the individual of a valuable property right. It seems to be absurd to claim that the town board could in this case proceed to hear, try, and determine its controversy with *Lawler* and forever conclude him by that determination. The rights of an abutter in a highway are just as sacred and just as much entitled to protection as is his right in the adjoining field or as is any other property right. The one can no more be taken without compensation than the other. Our law,

common and statute, which was in force when the easement was acquired determines the rights of the parties. It is not within the field of legislative competency to take from the abutting owner a single right or privilege which was secured to him by existing law, without adequate compensation. Town boards have the right to prevent encroachments and obstructions in highways. They cannot, however, adopt arbitrary definitions of these terms, and make encroachments or obstructions out of things which are not such in fact.

*Mr. Lawler* proposed to dig this ditch over his own land for his own purposes. Whether he had land to the west of the road is wholly immaterial, as I view the case. Whether he had the right to break the shore line in the construction of his ditch is also immaterial. If the shore line was left intact he might still construct and use his ditch, although it would not be as convenient for him as it would be to carry the ditch to the waters of the lake. The cases cited which recognize the right of an abutting owner to construct a ditch across a highway at grade enunciate no new principle. They correctly apply the general rule to specific cases of this nature. This general rule permits the abutting owner to use property which is his for any legitimate purpose which will not unreasonably interfere with the public use. That a ditch may be so constructed as not to work such interference is not only a matter of common knowledge, but the courts uniformly, as far as I know, so hold. The only question here is, Would the proposed ditch create such interference? and this is a question of fact which has been decided adversely to the appellants by the trial court on abundant evidence, and such finding has not been interfered with by this court.

Sec. 1346, Stats. 1898 (the so-called tunnel statute), confers no new right. It merely regulates the exercise of an existing one which the legislature can no more take away than it could take plaintiff's entire parcel of land without compensation. There is no doubt that the legislature has

the right to reasonably regulate the manner in which the abutting owner may exercise his rights in a highway. But regulation and confiscation are essentially different things. There can be no prohibition under the guise of regulation. The latter must be reasonably adapted to accomplish the end sought, and the regulative act itself must fall within the powers conferred on the body which seeks to regulate. *Kansas N. G. Co. v. Haskell,* 172 Fed. 545, affirmed *West v. Kansas N. G. Co.* 221 U. S. 229, 31 Sup. Ct. 564, and other cases heretofore cited. The power which the legislature of our state has conferred on town boards is one of regulation solely, and not one of confiscation or prohibition. The legislature carefully kept within constitutional lines when it enacted secs. 819, 1223, 1224, 1225, 1226, 1326, and 1330, Stats. Town boards cannot follow the maxim *Hoc volo, sic jubeo, sit pro ratione voluntas.*

While the trial court found as a fact that plaintiff owned land on both sides of the highway, there is nothing in the decision to suggest that it deemed such finding to be vital to the plaintiff's cause of action, or that the judgment would have been different had the circuit judge reached the conclusion arrived at by this court. The authorities cited demonstrate that an abutting owner on one side of a highway only, may construct lateral ditches on the portion of the highway which he owns and may also use the subsurface of the highway for any legitimate purpose although his ownership ceases at the center line of the highway.

I cannot see how the question of ownership on both sides of the highway is of any importance in the case, unless it is held that the so-called tunnel statute (sec. 1346) confers rights on the landowner which he did not have at common law. This is not my view of the statute. However, inasmuch as the court has held that the plaintiff was not entitled to judgment because he did not own on both sides of the road, and has decided by inference at least that he would be entitled to judgment if he did own on both sides, I feel it my

duty to discuss this question. I know that ordinarily there is little justification in writing a dissenting opinion on a pure question of fact. This is particularly true where the dispute is over the dry and uninteresting subject of surveys and boundary lines. The case, however, is one of a great deal of importance to the parties and has been argued and reargued in this court. Three of the judges who originally thought the judgment should be reversed expressed their views in an opinion by Mr. Justice TIMLIN. The court has expressed its views in the opinion on rehearing, and I feel that it is proper for those of us who do not agree with what is said in either opinion to state fully our reasons for the conclusions arrived at.

I cannot escape the conclusion that the action of the court in reversing the findings of fact made by the trial judge is unusual and even extraordinary. I think so because I believe that these findings are not against the clear preponderance of the evidence, but on the contrary are supported by such preponderance. I shall now proceed to give the reasons why I think so. The evidence bearing on the question whether Lake Geneva forms the western boundary of the highway where it passes through *Lawler's* land is of two kinds: surveys made in preparation for the trial of this case, and evidence aside from the surveys. I shall first consider the surveys.

In all, three surveys were made, one by an engineer, Mr. Teeple, assisted by another surveyor, Mr. Haskins, for the plaintiff; and two for the defendants, one by a Mr. Carlson and the other by a Mr. Powrie.

In reference to the qualification of Mr. Teeple, it may be said that he graduated from the mechanical engineering course at Cornell University in 1889, studied electrical engineering thereafter, taught electrical engineering in New Hampshire College for five years, then pursued engineering studies for two years at Harvard, and later did surveying for the Illinois Central Railroad for three seasons. His health

failing, he was obliged to quit the more active pursuits, and at the time of the trial he had been county surveyor of Walworth county for four years.

If it be assumed that he correctly located the point where the Norris survey crossed the north line of section 1, township number 1 north, of range 17 east, every surveyor who testified, including Professor Smith of the engineering department of the University of Wisconsin, testified that he pursued an absolutely correct method of relocating the line of the Norris survey. Briefly stated, Mr. Teeple's method was this: He ran a random line on what he assumed to be the correct variation of the needle between two established points on the line of the Norris survey, to wit, from a point four chains south of the west quarter corner of section 12 to a point 125 links east of the north quarter corner of section 1. He then measured the distance from this latter point to the point where his random line intersected the section line and corrected his random line by properly proportioning distances.

Mr. Norris made two records and two plats showing the location of his survey on October 24, 1839. Both were filed by the county clerk. One was offered in evidence as plaintiff's Exhibit 13 and the other as defendants' Exhibit 3. Exhibit 13 was recorded.

There were two differences between these exhibits. Exhibit 3 located one of Mr. Norris' stakes at a point which was marked by a bearing tree fifteen inches in diameter, located one and five-sixths degrees west of north from the stake and a distance of 1.51 links therefrom. In Exhibit 13 this distance is given as 151 links. This difference did not affect the result in this case, and it is only of importance in determining which plat is correct. I do not think there can be any question that Exhibit 13 correctly shows the above measurement. The idea that a surveyor who was plodding through the swamps, oak openings, and prairies of what is now Wal-

worth county, seventy-three years ago, locating his bearing trees within one one-hundredth of a link or one twelfth of an inch, is simply absurd.

The other difference between the records is material. Exhibit 3 shows a stake located on the Norris survey 1.25 links east of the quarter-section corner on the north line of section 1 aforesaid, being also the south line of section 36 in township number 2. Exhibit 13 shows this stake to be 125 links east of the quarter corner.

The Norris survey followed section lines from the southwest corner of section 26 to a point four chains south of the west quarter corner of section 12, a distance of two and a half miles, lacking four chains. There was no doubt as to the location of this quarter corner when the three surveys referred to were made. Mr. Teeple started his survey four chains south of this quarter corner, which was admittedly a correct point of commencement. He closed his survey 125 links east of the north quarter corner of section 1. Although both plats were in evidence, none of the surveyors made any contention that Mr. Teeple was not correct in so doing or that the survey should have been closed 1.25 links east of the corner. It has been argued on the appeal, however, that the learned surveyors and the still more learned counsel for the defendants did not discover that there was any difference between the two plats until the case was appealed to this court. However unwary counsel may have been, we cannot assume that their surveyors were not keenly observant of their employers' interests. They both had correct copies of Exhibits 3 and 13 long before they made their surveys, and it is not conceivable that they did not discover that there was a plain decimal point between the figures 1 and 25 in Exhibit 3. Neither is it conceivable that they did not regard the decimal point as an obvious error or as inserted to indicate that the measurement was 1 chain and 25 links. Much less can we presume that the court, which had both plats be-

fore it, did not consider both of them and conclude that Exhibit 13 was correct, unless we throw overboard the rule that has been lately enforced with unrelenting vigor in certain classes of cases, that this court will not reverse judgments unless prejudicial error affirmatively appears.   This court can indulge in no presumptions based solely on the statements of counsel, not conceded to be correct, that a trial court did not consider evidence legitimately before it.

For convenience a copy of that portion of Mr. Norris' plat showing the line of survey in dispute is herewith inserted.

*Mr. Lawler* owns a strip of land having a frontage of 400 feet on Lake Geneva.   This strip comprehends the north 300 feet of section 12 and the south 100 feet of section 1 adjacent to the lake and extending east for some distance, and it is the location of the highway for a distance of 400 feet over this strip with which we are concerned.   It is obvious that if Teeple's closing point is 125 links east of the north quarter corner of section 1 when it should be only 1.25 links, his survey swings too far to the east, and there is at least a narrower strip of land between the lake and the road where it passes over *Lawler's* land than the survey shows.

The questions for solution, then, are, Was Mr. Teeple justified in assuming that Exhibit 13 and the record thereof correctly showed the point where the Norris survey crossed the north line of section 1? and Did the court err in deciding that the Teeple survey was substantially correct?

In the first place, Exhibit 13 shows fourteen measurements in all.   Six of these show full chains and no links. Eight show chains and links both, but in no instance is any fraction of a link shown.   Exhibit 3 shows but two measurements containing fractions of a link.   One of these has already been discussed, and the manifest absurdity of locating a bearing tree to within one one-hundredth of a link has been alluded to.   It is manifest, to my mind, that as to this measurement Exhibit 13 is correct, and that in Exhibit 3 a

Lawler v. Brennan, 150 Wis. 115.

dot was placed between the 1 and the 51 either inadvertently, or intentionally with the purpose of showing the measurement to be 1 chain and 51 links. I think it is almost as absurd to conclude that Mr. Norris deviated one and one-quarter links, or less than ten inches, from the quarter line when he reached the north quarter corner of section 1. Before reaching section 1 he ran approximately three miles on section lines, and in going all of this distance he ran the center line of the road on the section line. When he came within four chains of the west quarter corner of section 12 he was obliged to deviate to the east because of the lake and of the contour of the country, so that when he reached the north and south quarter line running through section 1, we find that he crossed the same and located the west line of the road a trifle east of this quarter line. It requires a lot of faith to believe that Norris, because of the topography of the country, found it necessary to deviate ten inches from the quarter line in locating the center line of the road.

But there is an item of evidence which more conclusively demonstrates that Norris did not carry the center line of the road across the north line of section 1 only ten inches east of the quarter-post. This survey was made shortly after the government survey, when the government monuments were plain and readily found, and there can be no doubt that Norris found the quarter-post as he says he did. He made a plat of his road which was four rods wide, and its west boundary line is shown on this plat to be slightly east of the quarter corner, as will be seen by reference to the *facsimile* above inserted. While Mr. Norris might make a slight error in drawing his lines on this plat, it is well nigh inconceivable that he would throw the entire roadway east of the quarter corner, if his center line in fact ran within ten inches of it. He would in practice run the center line of the road through the corner if the correct measurement had been 1.25 links, because his plat was drawn on a scale of two inches to the

mile, and a variation of ten inches on such a plat would be
expressed by a deviation of about one three-thousandth of an
inch.   I know it has been said that if the correct distance of
the stake set by Norris from the quarter corner was 125 links
the plat does not throw the road far enough east.   But on a
plat drawn on so small a scale, the deviation of the west line
of the road from the quarter corner, in order to locate the
Norris stake where Teeple located it, would be so small as
to be imperceptible.   What we have definitely is the obvious
fact that the quarter-post is entirely outside of the highway
when it should be practically at its center line if Exhibit 3
is correct.

There is another obvious reason why the figures on Ex-
hibit 13 are correct—a reason which the only surveyor for
defendants who made a survey that could properly be called
such, seeks to explain by saying in effect that Norris made
a mistake in his survey.   It will be noticed by a reference to
the plat that the survey terminates nearly one half a mile
north of the north line of section 1.   The length of this piece
of road as surveyed is 36 chains and 79 links.   The course of
the survey through section 36, commencing at its south line,
is as follows: North 21 degrees 10 minutes W., 6 chains
and 79 links; from thence north 14 degrees and 12 minutes
east, 21 chains; from thence north 27 degrees 55 minutes
west, 9 chains to the north terminal point.   Running this
line on the courses and distances given and starting at a
point 1.25 links east of the north quarter-post of section 1
would not only run it through the middle of a steep embank-
ment twenty feet in height, but would run it into the lake
at a point about 1,500 feet from said quarter-post.   I have
been unable to find any evidence in the record which con-
tradicts this.   Following the Norris survey from a point 125
links east of the south quarter corner of section 36 would
bring the center line of the road about fifty feet east of the
top of this embankment.

Another circumstance tending to show that Exhibit 13 shows the correct survey is the fact that it was the one recorded in the surveyor's office. It is true that this record was not offered in evidence, but Mr. Teeple testified, without objection, to the fact.

Counsel very complacently assume that Exhibit 3 is correct and that therefore Exhibit 13 is incorrect, without a substantial fact to support such an assumption.

A good deal of attention has been devoted to the true location of the point where the Norris survey crossed the north line of section 1, because if Teeple did not determine the correct point of crossing, the accuracy of his survey would be materially impeached. To describe in detail the three surveys and point out the weaknesses in each would consume considerable space.

The Carlson survey may be disposed of summarily. It was evidently made with one object in view, and that was to throw the road over so close to the lake that the latter would form the boundary line of the highway where it passed through *Lawler's* land. The appellants neither justify nor claim anything under this survey, so nothing more will be said about it.

The appellants, however, do insist that the survey made by Mr. Powrie was made on correct principles, and that it is entitled to great if not controlling weight. Mr. Powrie made his survey on the theory that Norris in making his survey used the polaris or true meridian in running his lines. If Powrie was not correct in making this assumption, then his survey fails, and there is not a particle of evidence in the record to show that Norris used such meridian. It is just as logical to assume that Norris ran his line in accordance with the variation of the compass. All things considered, the latter is the more logical assumption of the two. In any event, the entire Powrie survey is based on a hypothesis that may be correct or may be incorrect. That the hypothesis is not a correct one must be accepted as a fact, unless it be assumed that

Norris did not correctly run his lines. Powrie, by assuming that Norris ran his lines on a true meridian and by following the courses and distances which he gave, found that the survey would cross the north line of section one, 151 links west of the quarter-post, whereas Norris stated in Exhibit 13 that his line crosses 125 links east, and, if it be assumed that Exhibit 3 is correct, the line still crossed east of the quarter-post. Powrie does not explain this discrepancy by actually claiming that the line in fact passed to the west of the quarter-post, because this would run the continuation of the road clear into the lake. What he does claim is that where Norris described his last course before reaching the quarter-post on the north side of section 1 as being 28 chains and 50 links north of the stake set on the section line, he really meant that he ran about three degrees west of north.

So, while some doubt and discredit may be thrown on the Teeple survey, when we come to the surveys made by the appellants we find one of them absolutely worthless and the other based on what is in all probability an entirely wrong hypothesis.

Counsel criticise the Teeple survey because of the fact that it is outside the line of the traveled track for a considerable distance. This is true, and it is also true that the Powrie line is outside of the traveled track a much greater distance.

An attack is also made on the Teeple survey because in carrying it onto the map which he made an error of ten feet was made at one point. The error is immaterial as to any question involved in the case, and in so far as it would affect the credibility of the witness it is more than offset by the fact that Mr. Powrie made three mistakes in carrying the survey of the road as made by him onto his map. Mr. Teeple was the only surveyor who made any attempt to find the monuments which marked the survey made by Norris. These monuments were old and decayed and it is always possible that a mistake in reference thereto might be made. Teeple and his asso-

ciates, however, were certain that they found the remnants of a number of these monuments, and there is nothing inherently improbable about the testimony. It was for the circuit court to pass upon its credibility and it has done so. There is no real dispute between Powrie and Teeple as to the correct location of the north quarter corner of section 1. Powrie simply says that he could not locate this corner. It can hardly be said in reference to this that there was even a dispute between the testimony of the two witnesses, and the circuit judge had little choice except to find in favor of the contention of the respondent on the question. The difference between them on this point, if it can be said that there is any, is not great enough to make any material change in the Teeple survey, in any event. Mr. Teeple did at one point change his line seven feet because of an original monument which he conceived he had found, and considerable fault is found with his having done this. But if the change was not made on sufficient evidence, it was wholly immaterial, because, if it had not been, the Teeple survey would still show a strip of land substantially twenty feet in width between the highway and the lake. In so far as the surveys were concerned, the circuit judge was confronted with this situation: He had a survey by Carlson admittedly worthless. He had one by Powrie which might have been made on a correct hypothesis, but in all probability was made on a wrong one; and he had a survey by Teeple, which, it may be admitted, was subject to some criticism, in that there was a bare possibility that Exhibit 3 correctly showed the point where the Norris survey crossed the north line of section 1, and there was also a possibility that Teeple did not get the correct location of the north quarter corner of this section.

Now, then, was there anything in reference to the Norris line that the court had before it which would satisfactorily and even conclusively show which of the contentions was right? I think there was. It must be remembered that

Norris made his map at substantially the same time that he made his survey; that he made it when he was familiar with existing conditions, and that we have it before us. A reference to the portion of it which pertains to the line of road through *Lawler's* land already appears. There is no difference between Exhibits 3 and 13 in this respect. In fact the plat shown herein is a blueprint taken from Exhibit 3. This has been used for convenience because no blueprints were taken of the other plat. Now, this plat shows a well defined strip of land between the lake shore and the highway on both sides of the section line which forms a boundary between sections 1 and 12. In fact it shows that the highway at no point along the lake extended to the shore line.

In view of the evidence furnished by this plat and in view of the character of the testimony pertaining to the surveys, I am wholly at a loss to see how a court could or can possibly reach the conclusion that Mr. Norris adopted as the west boundary line of the highway at the place in dispute the ordinary high-water mark of Lake Geneva. The Powrie and Carlson surveys throw the west line of the road actually into the lake. I do not of course contend that the plat would be better evidence than the survey itself. What I do contend is that where a competent surveyor has made a survey which corroborates the plat, the latter cannot be impeached by simply showing that another survey was made, when that other survey is based on an assumption which there is neither proof nor presumption to support.

No presumption can be resorted to in this case to the effect that the traveled track follows the center line of the road. We know from practical observation that this is not generally true of ancient highways, particularly where they were carried around obstructions. We know as a matter of fact that it is not true in this case if any attention whatever is to be paid to the Norris survey. That survey consists of a series of straight lines forming angles at the connecting points.

The survey from a point four chains south of the west quarter-post of section 12 to a point north of the *Lawler* land runs as follows: North 39½ degrees east 31 chains and 41 links; thence north 24 degrees 15 minutes east 7 chains and 44 links; thence north 9 degrees 45 minutes east 12 chains and 65 links; thence north 4 degrees west 14 chains and 37 links. We would naturally expect a curvature in the traveled part of the roadway at the angles, but all of the surveys show deviations from a straight line where there are no angles. All three of the surveys demonstrate conclusively that the roadway as built did not follow the center line of the highway as surveyed by Norris. In none of the surveys made does the alleged relocation of the Norris line coincide with the traveled track any considerable distance. Either Norris did not run straight lines as he says he did or else the traveled track was not built on the center line of the road. Such part of the right of way was used as was found to be best adapted for grading purposes. The expense of building roads when this one was constructed was considered of more importance than that there should be an air line for ox teams into the village of Lake Geneva.

Defendants' Exhibit 5, being a plat showing the Carlson survey, in the practical accuracy of which Powrie concurs, shows that the center line of the highway as it is claimed Norris surveyed it is in the lake from one to six feet at high water for a distance of 160 feet through the *Lawler* land. It shows that such center line for a considerable distance is but from five to eight feet from the low-water line. This would throw the north line of the road from thirty-five to forty feet into the lake at high stage and from twenty-five to twenty-eight feet at low stage. It requires an abiding faith in the infallibility of the defendants' surveyors to believe that Norris located his road in any such way, particularly when he solemnly declared in the plat which he made that he did nothing of the kind.

Of course there is a highway along this lake by user. But this does not mean that there is any highway by user two rods on either side of the center of the traveled track. It means that the public has the right to use the traveled track and enough land on either side to permit the convenient passage of teams and vehicles. *Bartlett v. Beardmore,* 77 Wis. 356, 46 N. W. 494; *Konkel v. Pella,* 122 Wis. 143, 99 N. W. 453; and *Neale v. State,* 138 Wis. 484, 120 N. W. 345. The defendants' surveys show that the center of the traveled track is from twenty to twenty-five feet from the high-water line of the lake. How much farther it is from the ordinary high-water mark which in reality forms the boundary line of the riparian owner does not appear. The traveled track is wholly within the limits of the survey of the road made by Mr. Teeple.

The court does not hold that the trial judge might not have very properly found that the Teeple survey was correct, if the case was to be decided on the surveys. It does hold that the dispute in the testimony between the surveyors raises a question of doubt as to which survey is correct, and in effect proceeds to disregard all of them and decides the case in defendants' favor on other evidence offered. This evidence principally consisted of testimony tending to show the location of the fence on the east side of the highway where it crossed the plaintiff's land, and also the location of a bridge over a creek on the line of the highway.

If the evidence of the surveyors creates a situation of uncertainty, that situation is not relieved by the testimony tending to show the location of the fence and the bridge. In the first place, it is fairly established by the testimony that the fence in question was not erected until more than twenty years had elapsed after the survey was made and the road was opened. Most of the witnesses who testified were familiar with the situation so far as fences were involved for a period of twenty-five years or less. One witness had an in-

distinct recollection that the original fence was erected as early as 1850. But Mr. Gavin, a witness for the defense, testified that he distinctly remembered when there was no fence along the east side of this portion of the highway. He was not born until 1856, seventeen years after the highway was opened up. By this time the traveled track had been well established, and no doubt the original monuments set by Norris had been largely obliterated; so there would be nothing very remarkable about placing a fence closer to the traveled track than it should have been placed had the survey been followed. There is another fact in reference to this survey that is still more significant. The witnesses all agree that the original fence was a rail fence which was later replaced by a wire fence. Mr. Button, the man who occupied the premises now owned by *Lawler,* testified that when the old rail fence had become useless and the new fence was built, it was not built on the line of the old fence but was built eight feet nearer to the traveled track. If this testimony is true, and really there is but very little to contradict it, it would show that *Lawler* had some land between the highway and the lake, if it be assumed that the rail fence was originally constructed on the correct boundary line. So I think the ancient fence did not help the defendants' case.

It is also said that Mr. Norris set a stake where his line crossed the creek, and that the presumption would be strong that the bridge was built where the stake was set and that it really marked the center of the highway. This might be so if we assume that highway builders in that day were following air-line routes and that they preferred to have the highway built along the middle of the right of way rather than to take advantage of the topography of the country and build bridges in places within the right of way where they could be most conveniently constructed. The road builders were not obliged to follow the center line of the right of way, but could deviate therefrom if it was

thought advantageous to do so.   That such was the common practice is a matter of common knowledge.

There are some other minor considerations urged in support of the decision of the court on the facts which I do not think I would be justified in discussing.   I do not feel that the surveys should be so cavalierly set aside.   Mr. Norris was evidently a competent surveyor.   He describes accurately and concisely the line of his survey.   The highway as constructed does not extend beyond the exterior boundary lines of the highway surveyed by Norris.   He gives his courses and distances and there is no doubt about the location of the starting point and there is no great reason why his line could not be re-established.   The probabilities are altogether in favor of the Teeple survey or the Powrie survey being correct.   If either is correct, then the road does not follow the center line of the highway.   In fact, if any reliance whatever can be placed on the Norris survey, the center line of the road did not follow that survey, but there was some deviation from side to side for convenience in building the highway, such deviation, however, not extending beyond the right of way.

As stated before, I think the trial court was correct in adopting the Teeple survey, and in any event this court should not say that the finding of the trial court is not sustained by the evidence.

MARSHALL, J.   I concur in the foregoing opinion by Mr. Justice BARNES.